Dawn VAILS, Plaintiff,

v.

**THE POLICE DEPARTMENT OF THE CITY OF NEW YORK, the City of New York, and Brian Callery, Defendants.**

**No. 96 Civ. 5283(DC).**

United States District Court,
S.D. New York.

July 15, 1999.

---

Giaimo & Vreeburg, P.C. by Joseph O. Giaimo, Julie L. Jassem, Kew Gardens, NY, for Plaintiff.

Michael D. Hess, Corporation Counsel of the City of New York by James Lemonedes, Catherine A. Green, Assistant Corporation Counsels, New York City, for Defendants.

*OPINION*

CHIN, District Judge.

In this case, plaintiff Dawn Vails contends that she was subjected to discrimination by the New York City Police Department (the "NYPD") on the basis of her gender in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII"). Vails was discharged in 1989, only four-and-a-half months after graduating from the police academy. She contends that she was refused training, subjected to sexual harassment, and ultimately fired because of her gender. She also contends that she was retaliated against for complaining of the discrimination.

The case was tried to the Court on June 21, 22, 28, and 29, 1999. The evidence presented at trial demonstrates that Vails was not subjected to actionable discrimination or retaliation and that instead she was fired because she was not qualified to be a

police officer. Accordingly, judgment will be entered in favor of defendants dismissing the complaint, with prejudice. The following constitute my findings of fact and conclusions of law.

### FINDINGS OF FACT

#### A. *Plaintiff*

Vails, a four-foot, eleven-inch woman of slight build, was employed by the NYPD from July 11, 1988 until October 4, 1989. She was twenty-two years old when she entered the NYPD Police Academy on July 11, 1988. She graduated from the academy on May 19, 1989 and was a probationary police officer ("PPO") until she was discharged on October 20, 1989.

#### B. *The Academy*

Vails had difficulty, both physically and academically, at the academy. For example, she was unable to complete her run (a distance of a mile and a half or less) on at least twenty-four occasions, often dropping out before completing even half of the run. (DX K, L; *see also* Tr. 18 (Vails acknowledging that "I had a very difficult time making the runs and I dropped out of the run a lot of days.")). She was placed on academic probation because she failed one subject on the first trimester exam and two subjects on the second trimester exam. Her examination grade average for the second trimester was 69%, below the acceptable "minimum" average of 70%. (DX J).[1]

Vails also had disciplinary and other problems at the academy. She was given a "command discipline"[2] for getting into a verbal altercation with another recruit, during which she stated that she would "drop her gun on purpose and let him get shot" if they were involved together in an incident. (DX K, P; *see also* Tr. 558). She was also given a command discipline for inappropriate and disrespectful behavior toward a supervisor when she was admonished for dropping out of her run after completing only twelve of thirty-six laps. (DX K, N).[3]

Vails was referred by the same supervisor for psychological evaluation because of, as he described it: "her complete lack of effort in gym. She has been counseled by various members of the [Physical Education Unit] staff to no avail. She has a propensity for crying when things don't go her way." (DX O). She was referred by a

1. Vails testified at trial on direct examination and initially on cross-examination that she only failed the one subject on the first trimester exam and that she "didn't fail anything else." (Tr. 26, 376). In fact, she was wrong, as she also failed two subjects on the second trimester exam. (DX J; *see* Tr. 377 (Vails conceding, when shown documentary proof that she had failed two subjects on the second trimester exam, that "[a]pparently I did, but I did forget.")).

2. A "command discipline" was given for a "serious infraction" by a police officer. (Tr. 228). The police officer was entitled to a hearing before a commanding officer, who would determine whether to sustain the command discipline. (*Id.*). If the command discipline was sustained, the commanding officer could impose discipline ranging from a "warn and admonish" to something more serious, such as the loss of vacation days. (*Id.*). A "minor infraction" was given, at an individual supervisor's discretion, for less serious breaches of the rules, regulations, and proce-

dures of the NYPD. (*Id.; see also* Tr. 154–55). Minor infractions were placed into a log to keep track of how officers were performing. (Tr. 154–55, 228, 615–16). Different sergeants had different styles with respect to minor infractions, and some were more likely to give a minor infraction while others were more likely, at least with the first infraction, to "warn and admonish" without making an entry into the minor infractions log.

3. In recommending the command discipline, Vails's supervisor wrote: "When told by the undersigned to continue running, she refused and glared menacingly. I repeated the order and again Probationary Police Officer Vails refused to respond but continued her disrespectful facial expressions toward me.... It is the opinion of the undersigned that P.P.O. Vails is guilty of a total lack of effort in [the calisthenics and jogging] class. She has been counseled repeatedly by members of the Physical Education Unit, but as yet she has failed to respond in a positive manner." (DX N).

different supervisor for possible counseling because of: "1. verbal argument with classmate PPO Siviglia stating she would drop her gun on purpose and let him get shot, 2. personal problems with choosing between 2 boyfriends, 3. physical training (run drops etc.) and 4. academic expectations not being realized." (DX P).[4]

Because of her difficulties at the academy, Vails was "held over" when the rest of her class graduated. She did graduate eventually—but not until May 19, 1989. Although Vails's classmates moved on to field training in December 1988 and most police academy recruits graduate after approximately five months (Tr. 24, 26), it took Vails more than ten months. Moreover, even then, she was earmarked for "special monitoring" during the field training that was to follow the academy. (DX Q).[5]

Vails's difficulties at the academy were not the result of any gender-based animus. Indeed, as Vails conceded, her evaluations at the academy were "justified." (Tr. 402).

## C. Field Training Unit 4

After leaving the academy, Vails was assigned to Field Training Unit ("FTU") 4, which was housed at the 19th Precinct on the upper east side of Manhattan. Because Vails had been "held over" for so long at the academy, and because of a hiring freeze in place at the time, Vails was the only new PPO arriving into FTU 4 at that time. (Tr. 49–50, 51–53, 572–73). There were a couple of other new officers in the FTU, but they had transferred into the NYPD from other police departments. In addition, there were PPOs who had graduated from the academy earlier, who had been receiving field training for some months, and who continued to receive training after Vails's arrival. (Id.).

### 1. Training

In FTU 4, Vails received different forms of training. A typical day would include roll call, inspection, a classroom lecture or demonstration, and various assignments or details. (Tr. 209, 568–71). Lectures and demonstrations covered subjects such as fingerprinting, handcuffing, baton use, legal issues, accident reports, other types of paperwork, and summonses. (Tr. 210, 569). In addition, PPOs rode with training sergeants in radio cars, and the sergeants provided training during those tours. (Tr. 213–14, 570–71). When PPOs were on assignments, including footposts, they received visits from the training sergeants. (Tr. 568, 570). All the PPOs, including Vails, participated in this training. (Tr. 212, 219–20, 571, 573, 586–88, 622–23).

The August 9, 1989 evaluation shows that Vails had seven tours in a radio car and six tours with a "Qualified Field Trainer" from May 22, 1989 through July 29, 1989. (PX 9). The September 18, 1989 evaluation shows that she had three tours in a radio car and eighteen tours with a

---

**4.** Vails's counsel suggested at trial that the reference to the two boyfriends was sexist or that the supervisor somehow breached a confidence by disclosing the information. (Tr. 560–61). I disagree, in both respects. Vails displayed poor judgment in telling her police academy instructor, at a time when she was having difficulty at the academy academically, physically, and psychologically, about her problems choosing between two boyfriends. In view of all the circumstances, it was appropriate for the supervisor to include the matter in the list of reasons why he believed counseling might be warranted.

**5.** One of Vails's former police academy instructors explained that "special monitoring" was for:

> marginal employees who have had psychological, disciplinary, other inappropriate behaviors. That's a caption that indicates that although they have passed the standards at the police academy, they didn't do it without some concern, and that that concern should travel with them in the field, that somebody should keep a special eye on them to see whether or not in fact they should be terminated or whether they should be allowed to continue in the police department.

(Tr. 555–56). Only a small fraction (two or three out of a class of forty) of each class is designated for special monitoring. (Tr. 556).

"Qualified Field Trainer" from August 1989 through September 1989. (PX 10). Vails's "Task Performance Lists," which list daily assignments on a monthly basis, show a number of assignments in radio cars and details to other precincts, including the 28th Precinct. (DX II–1; PX 4; Tr. 286–87).[6]

Vails also had difficulty learning to fingerprint. (Tr. 520, 590–91). On one occasion when Vails made an arrest, she took fingerprints from the person arrested. She had difficulty controlling the prisoner, but refused help. (Tr. 589–90). The prints were not accepted and had to be reprocessed by a different officer, and the desk officer "screamed" at Lt. Edward Sarner for not properly training Vails. (Tr. 520, 528–29).

## 2. *Discipline*

Vails encountered disciplinary and performance problems from her first day in

FTU 4, when she appeared for duty in civilian clothing without her uniform. (Tr. 220, 274–76). She was sent home for her uniform by her direct supervisor, Sergeant Richard McClintock, and she was given a minor infraction. (Tr. 208, 220, 275; PX 2).

Vails was in FTU 4 from May 22, 1989 through September 18, 1989. During that four-month period, she received ten minor infractions and one command discipline. (PX 2). The minor infractions ranged from not wearing her uniform on her first day to not having a proper flashlight to sitting in a transit authority emergency van when she was supposed to be on a footpost to not having a watch to engaging in unnecessary conversation to improperly preparing a summons. All or virtually all of Vails's ten minor infractions were justified.[7]

Vails received one command discipline while she was in FTU 4, for failing to take

**6.** Vails initially testified that during her first three weeks she did not receive any "station house training" or any instructions "at all" from "any superior" or any "car tours." (Tr. 32–33). Instead, she claimed that during her first three weeks she was "basically" assigned to post 19, the "punishment post," watching other police officers' cars. (Tr. 29–33). She also testified that for the period from three weeks after she started until September 1989, she received no training in FTU 4. (Tr. 35). She also testified that she only went out with a training sergeant in a radio car five times. (Tr. 743). The testimony is rejected, for the credible evidence, including documentary evidence, shows otherwise. (PX 4, 7, 9, 10; DX II, II–1, X; Tr. 219–21, 286–87). Indeed, when shown some of the documentation, Vails acknowledged that she received some training, but then contended that she did not receive certain kinds of training (*e.g.*, there was "general" training but no "specific" training). (Tr. 469–83, 753–55). She also contended that when she wrote down "orientation" in her memo book she was not being trained but was in fact "hanging out" and that she had been instructed by her superiors to write down "orientation" to falsely account for her time. (Tr. 483, 753–54).

**7.** Vails contends vigorously that the minor infractions were not justified, but her recollection of the events is simply not consistent with what actually happened. For example,

she contends that she had a proper flashlight, one issued to her by the academy, and that Sergeant Brian Callery gave her a minor infraction for the flashlight unjustifiably. (Tr. 39–40; *see* PX 2). In fact, however, documentary proof exists to show that it was McClintock, not Callery, who gave her the minor infraction for the flashlight, and that McClintock did so because Vails was carrying a "little pen light," which was not a proper flashlight, rather than a "real flashlight." (DX H; *see* Tr. 231–34). Vails also contends, for example, that Callery gave her a minor infraction for sitting in a transit van when she was simply leaning into the van (Tr. 46), but the documentary evidence shows that it was McClintock, not Callery, who wrote her up for sitting in the van. (Tr. 227, 414–21; DX Z). She contends also that she was given a minor infraction on August 14, 1989, a day when she was not on duty. (Tr. 111–12). Her memo book, however, shows that although she did have a day off on August 14, 1989, her tour that began on August 13, 1989 ran past midnight—until 2:05 a.m. on August 14th. (PX 7). Hence, she did work on August 14th. She contends also that she was improperly given a minor infraction for improper summons writing on July 25, 1989 in part for running out of summonses, which she contends happened because she had written so many summonses. (Tr. 431–32). Yet, her Task Performance List, which she signed, shows no summonses issued on July 25, 1989

police action during an incident on August 13, 1989. (Tr. 91–99, 441–68, 578–86). According to Vails, a car hit or grazed a seven-year-old boy and left the scene. Vails spoke to the boy, who appeared to have sustained only a skinned knee. The boy refused an ambulance and left. Vails failed to determine the boy's identity and let the boy go without notifying his parents and she also failed to put out a radio message about the incident, even though the vehicle left the scene. (DX T; Tr. 580–81). As Vails acknowledges, she failed to follow proper police procedure. (Tr. 460, 580–82; DX R, T). A seven-year-old child should not have been permitted to leave the scene unattended, even if he denied any serious injury. (Tr. 581). Sergeant Richard Wojno issued Vails a command discipline, which was sustained by Inspector Brian Lavin. The discipline imposed was instruction and a "warning and admonishment." (DX R; Tr. 467–68). Vails accepted the disciplinary action. (Tr. 468).

Vails had other problems on the job, for which she did not receive minor infractions or command disciplines. For example, she appeared for duty wearing black sneakers and was told not to wear them at work. (DX Y). Yet, six days later she wore them to work again and thus she had to be admonished a second time for wearing sneakers on the job. (Tr. 225–26; DX H; *but see* Tr. 100 (Vails denying wearing black sneakers on patrol)). On another occasion, Vails had her radio set to the wrong frequency and went into a building to answer a call by herself without backup, an unsafe practice. (DX AA; Tr. 236). On another occasion, Vails failed to properly fill out a summons, then gave the wrong copy to the motorist, and then failed to respond to someone needing assistance—all in one day. (DX S; Tr. 427–28, 575–77).

### 3. *Evaluations*

While she was in FTU 4, Vails received three types of evaluations. First, she re-

ceived Field Evaluation Worksheets from four training sergeants on at least fourteen different days: McClintock (DX H, X, Y, Z, AA), Callery (PX 14, 16; DX BB, CC), Wojno (DX S, T, U, V), and Paul Schulze (DX W). The Worksheet form provided for the supervisor to rate the PPO in twenty-three categories of performance on a scale of "1" to "5," with "5" being "superior," "3" being "minimum acceptable," and "1" being "not acceptable." Vails did not receive a single rating higher than "3" in any of the twenty-three categories on any of the fourteen worksheets, and she received numerous ratings of "2" (below minimally acceptable) and "1" (not acceptable). Moreover, the Worksheets contain comments such as "too timid" and "Very, Very Timid." (DX H, Y). One sergeant wrote that Vails "is unable to listen to radio transmission + drive at the same time. She prefers to talk rather than work." (DX W). Another wrote: "This officer is proving very difficult to train. She seems to resent criti[ci]sm or effort to improve her abilities." (PX CC). At least two of the Worksheets made note of Vails's size. One, written by McClintock, observed: "Does Not Seem to Have Peripheral Vision When She Drives (Maybe Just to [sic] Short to See over the Headrests)." (DX H; *see also* Tr. 231, 235 (McClintock testifying that Vails had to roll up and sit on her raincoat to see over steering wheel of patrol car)). The second, written by Callery, noted: "This officer is a very small woman, who has demonstrated her inability to handle an arrest situation." (PX 14).

Second, Vails received two PPO Field Training Evaluations. The first was prepared by McClintock on August 9, 1989 and rated her overall as "below standards." (PX 9). The evaluation, which was reviewed and concurred in by Sarner, and which Vails did not appeal, noted that: "[Vails] is not capable of handling street situations and appears to lack self confi-

and only one summons issued in the four days

she worked before then. (PX 4).

dence. This officer is a borderline case and after speaking to officer, P.O. Vails promises to do better next evaluation." (PX 9; *see also* Tr. 249–50). The evaluation also noted: "[Vails] seems to be very insecure and needs to develop self confidence. [Vails] is quick to blame others for [her] own inadequacies. P.O. Vails has had several summonses voided due to mistakes and has a poor discipline record as of this date." (*Id.*). The second PPO Field Training Evaluation was received by Vails on September 18, 1989, which again rated her performance overall as "below standards." (PX 10). The evaluation noted:

> This officer has consistently demonstrated an inability to perform basic police tasks. Any criticism leveled at this officer, no matter how constructive[,] is grudgingly accepted with sullen insolence. The officer lacks self-motivation and with a demonstrable inability to function as a working street cop. This presents a danger to other officers. The prognosis for the future of this officer is dismal, unless there is a marked improvement. This officer merits close and direct supervision.

(*Id.*). The evaluation, again which Vails did not appeal, was prepared by Callery, and concurred in by Schulze, Wojno, and Lt. Thomas O'Connell. (*Id.; see* Tr. 251, 533).

Third, Vails received a performance evaluation when she was transferred out of FTU 4. (PX 11). The evaluation was prepared by Callery and reviewed by O'Connell, and it essentially reiterated the criticisms contained in the other evaluations, including the overall performance rating of "below standards." (*Id.;* Tr. 534, 536). It was given to Vails by O'Connell. (Tr. 536).

#### 4. *The July 29, 1989 Conversation*

On July 29, 1989, approximately two-and-a-half months into her training at FTU 4, Vails had a private conversation with Callery. (Tr. 671–75). Callery reviewed Vails's performance with her. (Tr. 671). He was blunt, telling her that "she wasn't coming up to snuff," that her performance was "poor," and that she was not able to perform basic functions, such as control a prisoner or control a "situation." (Tr. 671–72). Vails responded: "It's not true, you're unfair." (Tr. 672).[8]

#### D. *Field Training Unit 6*

Vails was transferred out of FTU 4 and into FTU 6 on September 18, 1989. (Tr. 34). Her performance problems continued.

On September 20, 1989, for example, she had difficulty fingerprinting during a training class, as "[s]he continued to print the subject's right hand in area of card for the left (clearly marked)." (DX FF; Tr. 488, 548).

On September 27, 1989, she failed to respond to radio calls and was found by the FTU 6 training sergeant, Joseph Crupi, on the wrong side of the avenue a block-and-a-half outside her post, as she had left her post to make a personal telephone call. (DX GG; Tr. 548–49).

---

8. Vails alleges that the conversation with Callery went as follows:

> And he said, "You're never going to make it on this job." And I said, "Why do you say that?" He said "Well, first of all you're a woman. And look at yourself, Dawn. Look at yourself, you don't belong here on this job." And I said, "How can you say that?" And I said, "Just because I'm small?"
>
> He says, "You're a puny little thing.... You're going to get your partner or yourself killed"....
>
> I said, "Sir, there are plenty of women my size that do a very good job of policing."
>
> And he said to me, "No, they're not doing a good job of policing, Dawn, they're doing head." And at that point he leaned over, and he came close to me, and he looked me in the eyes, and I knew exactly what he was hoping *my* response would be....
>
> [H]e said "I'm going, I'm telling you, Vails, I'm going to get you, I'm going to fuck you one way or another. You're not going to last on this job."

(Tr. 64–66; *see also* Tr. 400). Vails's testimony is not credible, and I find that the conversation did not happen in the manner that she described.

On September 28, 1989, she was criticized for being too tentative while driving and for jamming on the brakes before reaching the intersection at a red light. (DX HH).

### E. *Vails's Complaint of Discrimination*

On October 3, 1989, Vails submitted a complaint of discrimination to the NYPD's Office of Equal Employment Opportunity (the "OEEO"). (PX 30). Attached to the complaint were some forty typed pages of Vails's notes. (PX 3). In her written complaint, Vails alleged that Callery had tried "to get" her to resign in the July 29, 1989 conversation, when he purportedly said that she was "to [sic] punie [sic] to do the job." (PX 30). She alleged that Callery stated that "the only reason women get [certain] details is because they are doing *head.* Am I that type of girl?" (*Id.* (emphasis in original)). Vails contends that Callery propositioned her and that if she had succumbed to his sexual advances, her "evaluations would have been written correctly instead of fraudulently" and she would never have been fired. (Tr. 400–01).

Callery was the only respondent named in Vails's OEEO complaint, and Vails never complained about any supervisor other than Callery. (Tr. 745). At trial, however, she contended that none of the other training sergeants gave her any training. When pressed as to why she believed they refused to give her training, she stated that "they knew that Callery was out to get me and they were conforming to what he wanted." (Tr. 745). When asked when Callery decided to get rid of her, she responded July 29, 1989, when she refused his purported sexual advances. (Tr. 746–47).[9] When it was pointed out to her that

she had contended that the other sergeants failed to give her training even before July 29th, she testified simply that male officers received training when she did not. (Tr. 747–52).

Vails's OEEO charge of discrimination was not resolved until June 29, 1990, after her employment was terminated, when the Deputy Commissioner of Equal Opportunity of the NYPD issued a memorandum concluding that Vails's charge of sexual discrimination was "unsubstantiated" and that her charge of retaliation was "unfounded." (DX D; *accord* DX C).

### F. *Vails's Dismissal*

On October 4, 1989, the day after Vails filed her OEEO complaint, Helen R. Tanzosh, the Director of the Employee Management Division of the NYPD, recommended that Vails's employment be terminated because of her "overall performance and behavior since her appointment," and that she be given an opportunity to resign. (PX 29). DeForrest W. Taylor, Chief of Personnel, concurred on October 5, 1989. (*Id.*). Richard J. Condon, First Deputy Commissioner, concurred on October 6, 1989. (*Id.*). And on October 10, 1989, Police Commissioner Benjamin Ward approved the decision to terminate Vails's employment if she did not resign. (*Id.*).

On October 20, 1989, Lt. Christopher Darcey spoke with Vails and asked her to resign. (Tr. 75–76). She refused. (Tr. 77). Darcey then advised her that she was being dismissed and handed her a letter of dismissal. (*Id.;* PX 13).

---

9. Vails testified at trial as follows:
   THE COURT: When was it that Callery, to your knowledge, decided that he wanted to get rid of you? First day? First week? Do you know?
   [Vails]: I do know when.
   THE COURT: When?
   [Vails]: It was July 29th.
   THE COURT: Prior to that, he was not trying to get rid of you?

   [VAILS]: Prior to that he was just making the little comments.... But prior to that I didn't think he was out to get me....
   THE COURT: So you are saying you believe that it was July 29 after you rejected his advances that Sergeant Callery decided he wants to get rid of you?
   [Vails]: That's exactly what I'm saying.
   (Tr. 746–47).

## G. Prior Proceedings

### 1. The State Division

Vails filed a charge of discrimination and retaliation against the NYPD with the New York State Division of Human Rights (the "NYSDHR") on December 27, 1989. The NYSDHR conducted a ten-day hearing on the charge. Vails was represented by the same attorney who represented her in the instant case. An Administrative Law Judge issued detailed recommended findings of fact and a recommended decision and opinion on November 4, 1994, concluding that Vails had not been the subject of gender discrimination, sexual harassment, or retaliation and that Vails had been dismissed for legitimate, nondiscriminatory reasons. (DX A). The recommended findings and decision were reviewed and adopted by the Commissioner Designee of the NYSDHR on January 31, 1995. (Id.).

The NYSDHR's findings as well as the record of the proceedings were reviewed by the Equal Employment Opportunity Commission (the "EEOC"). On April 19, 1996, the District Director of the EEOC concluded "that the evidence ... does not establish violations of [Title VII]." (DX B).

### 2. The Instant Case

Vails filed the instant lawsuit on July 9, 1996 against the City of New York (the "City"), the NYPD, and Callery. Her complaint alleged violations of the United States Constitution, the New York State Constitution, Title VII, the New York Executive Law, and the New York Civil Rights Law § 40-c. In a decision dated June 16, 1998, I dismissed all the claims except the Title VII claims against the City and the NYPD. *Vails v. Police Dep't of the City of New York,* No. 96 Civ. 5283, 1998 WL 318709, at *1–2 (S.D.N.Y. June 17, 1998). I dismissed the state Executive Law claims because Vails had elected to have them adjudicated by the NYSDHR and was therefore precluded from pursuing those claims in any court by virtue of the election of remedies provision of the Executive Law. *See* N.Y. Exec. Law § 297(9) (McKinney Supp.1999); *Moodie v. Federal Reserve Bank of New York,* 58 F.3d 879, 882–84 (2d Cir.1995). Vails was not, however, precluded from pursuing her Title VII claims in this Court.

Thereafter, I determined that Vails was not entitled to a jury trial because the only claims remaining in the case were Title VII claims and the alleged discrimination occurred before the enactment of the Civil Rights Act of 1991 (the "1991 Act"), which amended Title VII to provide for jury trials, but prospectively only. *See* 42 U.S.C. § 1981a(c); *Landgraf v. USI Film Prods.,* 511 U.S. 244, 249, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).

I conducted the trial on June 21, 22, 28, and 29, 1999.

## DISCUSSION and CONCLUSIONS OF LAW

### A. Applicable Legal Standards

Title VII prohibits discrimination with respect to the "compensation, terms, conditions, or privileges of employment" on the basis of "race, color, religion, sex, or national origin." 42 U.S.C. § 2000e *et seq.* Hence, Title VII prohibits an employer from discriminating against an employee because of her gender.

Sexual harassment is a form of gender discrimination and consists of unwelcome sexual conduct that affects the terms and conditions of employment. There are two types of sexual harassment: (1) quid pro quo (or tangible benefit) sexual harassment, where the employee proves that she was denied a tangible employment benefit because she refused to submit to a supervisor's sexual demands, and (2) hostile environment sexual harassment, where the employee proves unwelcome sexual conduct that is so severe or pervasive it alters the terms and conditions of employment by creating a hostile, or abusive, work environment. *See generally Burlington Indus., Inc. v. Ellerth,* 524 U.S.

742, 118 S.Ct. 2257, 2264–65, 141 L.Ed.2d 633 (1998); *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993); *Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 436–37 (2d Cir.1999); *Galdieri–Ambrosini v. National Realty & Dev. Corp.,* 136 F.3d 276, 289–90 (2d Cir.1998).[10]

Title VII also prohibits retaliation against an employee for opposing any practice prohibited by the statute. 42 U.S.C. § 2000e–3(a); *see Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 768 (2d Cir.1998); *Wimmer v. Suffolk County Police Dep't,* 176 F.3d 125, 134 (2d Cir.1999); *Sarno v. Douglas Elliman–Gibbons & Ives, Inc.,* 183 F.3d 155 (2d Cir.1999) (retaliation in Americans With Disabilities Act case). An employer may not intentionally subject an employee to adverse employment action because the employee engaged in protected activity—the key is whether the employee proves a causal connection between the protected activity and the adverse employee action. *See Quinn,* 159 F.3d at 768–69.

■ Of course, the "ultimate question" in any Title VII case is whether the plaintiff proves that, more likely than not, she was the victim of intentional discrimination or retaliation, that is, that the employment decision was motivated, at least in part, by an impermissible reason. *Coffey v. Dobbs*

*Int'l Servs., Inc.,* 170 F.3d 323, 326 (2d Cir.1999) (noting that the Second Circuit does not determine whether plaintiff has established a prima facie case for retaliation claim tried on the merits, but that the court "proceed[s] directly to the ultimate question of discrimination ... [,] whether [plaintiff] introduced sufficient evidence to support a finding that [defendant] intentionally discriminated against her in retaliation") (internal quotations and citations omitted).

Finally, I must also consider whether, even assuming *arguendo* Vails has proven that the NYPD's decisions were motivated in part by her gender, defendants have proven that they would have dismissed Vails in any event, that is, even if they had not taken her gender into consideration. In *Price Waterhouse v. Hopkins,* 490 U.S. 228, 242, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989), a plurality of the Supreme Court concluded that when a plaintiff in a Title VII case proves that her gender played a part in an employment decision, "the employer shall not be liable if it can prove that, even if it had taken gender into account, it would have come to same decision."[11]

**B. Application**

Vails asserts five Title VII claims: hostile environment sexual harassment, quid

**10.** The NYPD has been sued a number of times for gender discrimination or sexual harassment. *See, e.g., Sorlucco v. New York City Police Dep't,* 971 F.2d 864 (2d Cir.1992); *Tubens v. Police Dep't of the City of New York,* 48 F.Supp.2d 412 (S.D.N.Y.1999); *Richards v. New York City Police Dep't,* Nos. 97 Civ. 0179 & 97 Civ. 5828, 1999 WL 33288 (S.D.N.Y. Jan. 25, 1999); *Domenech v. City of New York,* 919 F.Supp. 702 (S.D.N.Y.1996); *Dennis v. New York City Police Dep't,* No. 89–CV–7810, 1992 WL 177157 (S.D.N.Y. July 13, 1992); *Watts v. New York City Police Dep't,* 724 F.Supp. 99 (S.D.N.Y.1989); *Burke v. New York City Police Dep't,* 115 F.R.D. 220 (S.D.N.Y.1987).

**11.** The 1991 Act partially overruled *Price Waterhouse.* Section 107(a) of that Act, codified at 42 U.S.C. § 2000e–2(m), provides that an employment practice is unlawful if there are

both legitimate and illegitimate motivations for it. Section 107(b) of the Act, codified at 42 U.S.C. § 2000e–5(g)(2)(B), provides that if a plaintiff proves a violation of section 107(a), but the defendant demonstrates that it "would have taken the same action in the absence of the impermissible motivating factor," the court may grant declaratory and injunctive relief as well as attorneys' fees. *Donovan v. Dairy Farmers of Am., Inc.,* 53 F.Supp.2d 194, 1999 WL 402493, at 4–5 (N.D.N.Y.1999). Because Vails's employment was terminated in 1989 and the 1991 Act does not apply retroactively, *see Landgraf,* 511 U.S. at 249, 114 S.Ct. 1483, if the NYPD demonstrates that it would have taken the same action regardless, Vails would not be entitled to any relief, even assuming she proved that her gender was a motivating factor in the NYPD's decisions.

pro quo sexual harassment, failure to train, termination of employment, and retaliation. The factual bases for these claims are essentially the same, except that the retaliation claim also requires some discussion of the timing of the filing of the OEEO complaint of discrimination and the termination decision. Accordingly, I discuss first the claims of harassment and discrimination and second the claim of retaliation. Finally, I discuss the issue presented by *Price Waterhouse*.

### 1. *Discrimination and Sexual Harassment*

■ Vails's proof of discrimination and sexual harassment consists primarily of the following: (1) Callery's alleged July 29th sexual advance; (2) Callery's other purportedly sexist comments, as well as his alleged admissions to others; (3) the failure of the sergeants, including Callery, to train her; and (4) the purported pretextual nature of the minor infractions.

As a factual matter, these allegations are rejected. I conclude that the facts simply were not as Vails contends and that Title VII was not violated.

As to the July 29th conversation, I have no doubt that Callery was blunt and brutally honest with Vails. Callery believed that Vails was the "worst recruit" he ever trained, and he undoubtedly told Vails this in a way she found disturbing. (Tr. 680). Vails testified in such an inconsistent and incredible manner in general, however, that I simply am not persuaded that Callery uttered the words she attributes to

him. Moreover, the fact that Vails may have reported Callery's alleged statements to others does not necessarily prove, of course, that the statements were made.[12]

Callery did make reference in one of the Field Evaluation Worksheets to Vails as "a very small woman." (PX 14).[13] He undoubtedly made other ill-advised comments to Vails as well.[14] He also acknowledged that as a supervisor he would never supervise or meet with a "female officer or a female subordinate" alone (Tr. 698–99), a comment that betrays some bias. (*See also* Tr. 285 (McClintock testifying that "you wouldn't go into a closed door [room] with a woman, would you?" and that it would be "inappropriate for a police sergeant to interview a police officer who is a female in a room where no one could see you")). Moreover, he apparently did make some derogatory comments about Vails to a detective, Jose Alfonso, in an informal conversation in a bar, after she was fired. (Tr. 348–49, 353–55).[15] These circumstances certainly give me some pause, but, as discussed below, the other evidence in the case demonstrates overwhelmingly that Vails was dismissed not because she is a woman but because she was not capable of being a police officer.

Likewise, Vails's inconsistent and shifting contentions that she did not receive any training or proper training or specific training because she is a woman are rejected. The credible evidence in the case, including the contemporaneous documents, Vails's own contemporaneous reports, and the testimony of McClintock and Wojno,

---

**12.** Vails testified that she complained about Callery to "almost every cop that I knew." (Tr. 71).

**13.** The record contains other comments about Vails's size as well. Size, by itself, however, is not a gender-specific characteristic. Moreover, Vails's problem was not just a physical one, but one of attitude.

**14.** Several witnesses testified that Callery was tough on all recruits. Police Officer Haynes, for example, testified that Callery "treated everybody pretty crude and rude. He was a

rude person. ____ He was an obnoxious man." (Tr. 307, 312). Title VII, of course, is not a "code of civility." *See Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 118 S.Ct. 998, 1002, 140 L.Ed.2d 201 (1998) (noting also that "workplace harassment" is not "automatically" actionable gender discrimination "merely because the words used have sexual content or connotations").

**15.** In the end, however, Alfonso testified that he did not know that Callery treated Vails differently from any other PPO. (Tr. 356).

among others, demonstrates that she received extensive training.

Finally, Vails's evidence of pretext is rejected. Her contentions that the minor infractions were not justified is not based on reality. She contends that virtually all of them were issued to her by Callery, when that simply is not so. Although I cannot conclude, on the evidence presented, that they were all justified, I am not persuaded that any were *not* justified, and I find that the majority were completely justified.

In short, Vails has not proven by a preponderance of the credible evidence that she was adversely treated or fired because of her gender. I find that she was not.

### 2. *Retaliation*

■ Nor has Vail met her burden of proving by a preponderance of the credible evidence that she was retaliated against by the NYPD for filing a claim of discrimination. She has not shown that the timing of her filing of her OEEO complaint (October 3, 1989) and the request for her termination (October 4, 1989) was anything but a coincidence. *See Brown v. Coughlin,* 965 F.Supp. 401, 407 (W.D.N.Y.1997) ("timing of events alone, even if sufficient to meet plaintiff's prima facie burden of showing retaliation, [did] not defeat defendant's motion for summary judgment") (citing to *Reilly v. Metro–North Commuter R.R. Co.,* No. 93 Civ. 7317, 1996 WL 665620, at *14 (S.D.N.Y. Nov. 15, 1996)). Indeed, Vails had been receiving negative performance evaluations and worksheets for months, and, as discussed below, it was apparent that it was only a matter of time before her poor performance and attitude required that her probationary period end with the termination of her employment.

### 3. *Price–Waterhouse*

■ Finally, even if I were to assume that Vails has proven that the NYPD's decisions were motivated in part by her gender or the filing of her OEEO charge, I would nevertheless enter judgment in favor of defendants, for I conclude that the NYPD and the City have proven by a preponderance of the evidence that Vails would have been fired regardless of any such impermissible motivation. Indeed, defendants have demonstrated convincingly that Vails was not competent and that she was not qualified to be a police officer.

While she was at the academy, Vails showed that she was, at best, a border-line recruit. She had problems there physically, academically, and psychologically. She acknowledges that the criticisms of her performance at the academy were justified and she does not suggest that she was treated in an unfair or discriminatory manner there. Although she did graduate, the NYPD permitted her to do so essentially to give her an opportunity to prove herself in the field, and she was placed on special-monitoring.

She did not, however, prove herself in the field. She continued to have serious problems. Instead of acknowledging those problems, however, she sought to blame others, particularly Callery.[16] But the evidence demonstrates that it was not just Callery who felt she was incapable of becoming a competent police officer. Rather, McClintock, Sarner, Wojno, Crupi,

---

16. Vails had an unrealistic response or someone else to blame for every problem at the academy or in the field. For example, she contended that she failed parts of the second trimester exam because she "knew too much." (Tr. 378). It was not her fault, as she "perceived it," that she got the command discipline for the verbal altercation at the academy, because the instructor heard her make a comment but not the other person. (Tr. 381). It was not her fault that she did not bring her uniform to work the first day because "the directions weren't made clear to [her]." (Tr. 391). When her own memo book entries were shown to her to contradict her claim that she received no training, she responded essentially that she had been instructed by her superiors to make false entries in her book. (Tr. 482–83). Although she received negative evaluations in FTU 6 as well, the evaluations were, according to Vails, "poisoned" by Callery. (Tr. 487).

Schulze, and O'Connell, among others, also felt that her performance was grossly deficient, and it was her poor performance and behavior that led to her dismissal. (*See, e.g.,* Tr. 252, 525, 550; PX 9, 10, 11).

I reject Vails's allegations of a grand conspiracy, the fabrication of documents, and the filing of false disciplinary charges, all purportedly to assist Callery in his supposed scheme to "get rid" of her. I reject the contention that numerous police officers and former officers committed massive perjury in the proceedings before the NYSDHR and at this trial in an effort to defeat Vails's claim of discrimination. I agree with the decisions of (1) the Director of the Employee Management Division of the NYPD, (2) the Chief of Personnel of the NYPD, (3) the First Deputy Commissioner of the NYPD, (4) the Commissioner of the NYPD, (5) the Deputy Commissioner for Equal Employment Opportunity of the NYPD, (6) the Administrative Law Judge of the NYSDHR, (7) the Commissioner Designee of the NYSDHR, and (8) the District Director of the EEOC that Vails's poor performance and behavior as a PPO warranted the termination of her employment. For all these reasons, I hold that defendants are entitled to entry of judgment dismissing plaintiff's claims of discrimination, sexual harassment, and retaliation.

### CONCLUSION

The Clerk of the Court shall enter judgment against plaintiff in favor of defendants dismissing the complaint, with prejudice and with costs (but not attorneys' fees).

SO ORDERED.