**Anthony ZIMMITTI, Plaintiff,**

v.

**AETNA LIFE INSURANCE CO., Defendant.**

**No. 2:92CV187 (RNC).**

United States District Court, D. Connecticut.

Sept. 13, 1999.

70

Gregg D. Adler, Livingston, Adler, Pulda & Meiklejohn, James L. Kestell, Kestell & Associates, Hartford, for Plaintiff.

Albert Zakarian, Shane T. Munoz, Victoria Woodin Chavey, Day, Berry & Howard, Hartford, for Defendant.

## RULING AND ORDER

CHATIGNY, District Judge.

This employment discrimination case has been remanded by the Court of Appeals for reconsideration of the defendant's motion for judgment as a matter of law in light of *Fisher v. Vassar College,* 114 F.3d 1332 (2d Cir.1997) (in banc), *cert. denied,* —— U.S. ——, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998). After careful review of the trial transcript and the parties' memoranda in light of the opinions in *Fisher* and other cases, I believe the evidence is sufficient to sustain the jury's verdict. Accordingly, the defendant's motion is denied.

### I.

In *Fisher,* the Court of Appeals addressed the nature and effect of a finding of pretext in an employment discrimination case under the three-step burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). In particular, the Court considered whether a sustainable finding of pretext always entitles the plaintiff to prevail. The Court ruled that a "plaintiff may prevail only if an employer's proffered reasons are shown to be a pretext for discrimination, either because the pretext finding itself points to discrimination or because other evidence in the record points in that direction—or both." *Id.* at 1339. The in banc majority explained that

discrimination does not lurk behind every inaccurate statement. Individual decisionmakers may dissemble in order to hide a reason that is non-discriminatory but unbecoming or small-minded, such as back-scratching, logrolling, horse-trading, institutional politics, envy, nepotism, spite or personal hostility .... In short, the fact that the proffered reason was false does not necessarily mean that the true motive was the illegal one argued by the plaintiff.... The sufficiency of the finding of pretext to support a finding of discrimination depends on the circumstances of the case.

*Id.* at 1337–38.

The plaintiff in *Fisher* had produced some evidence of pretext. However, the Court determined that neither the pretext

finding nor the rest of the record pointed to the conclusion that she was a victim of unlawful discrimination. Accordingly, the judgment in her favor was reversed. *Id.* at 1347.

## II.

Plaintiff Anthony Zimmitti claims that defendant Aetna Life Insurance Company, his longtime employer, terminated his employment in connection with a reorganization and reduction in force because of his age in violation of the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.* At the trial, plaintiff's last supervisor at Aetna, Walter Cieslak, testified that the termination decision was "basically" his in that his recommendation that the plaintiff's employment be terminated was approved by the ultimate decisionmaker, Peter McGowan.[1] Cieslak explained to the jury that the plaintiff's employment was terminated because he was not as well-qualified as the employee who was chosen to assume the duties and responsibilities of the plaintiff's former position, Monica Reidy. Asked whether age was a factor in the decision, Ceislak testified, "Absolutely not."[2]

The plaintiff did not deny that Reidy is a "capable individual," JA 231, who was qualified for the position, JA 254, but claimed that he was the best qualified candidate. JA 240. He vehemently disagreed with Cieslak's unfavorable evaluation of his qualifications, describing it as a "mockery." JA 233. The plaintiff testified that if Aetna's guidelines for the reorganization had been followed, he would have kept his job, JA 235, and that he was

terminated "because [his] age group didn't fit into the new group." JA 240.

To prove his ADEA claim, the plaintiff relied on various pieces of circumstantial evidence. At the time the reorganization was announced, he was 55 years of age, which made him significantly older than Cieslak, who was 32; McGowan, who was 39; and Reidy, who was 41. Cieslak's assessment of the plaintiff's qualifications conflicted with performance evaluations done by the plaintiff's previous supervisor, who was slightly older than the plaintiff and had supervised him until just before the reorganization was announced. The plaintiff contended that Cieslak had failed to adhere to Aetna's guidelines for the reorganization in that, among other things, he had failed to give him the benefit of an incumbent preference. In addition, the plaintiff relied on a statement Cieslak allegedly made to him not long after his employment was terminated. It is undisputed that about six weeks after Cieslak told the plaintiff his employment was terminated, the plaintiff called Cieslak to get some documents he needed to try to obtain another position with the company. According to the plaintiff, when Cieslak realized what the plaintiff was calling about, he said to him, "But I thought you were retiring." JA 100.[3]

In closing arguments, plaintiff's counsel urged the jury to find that the plaintiff's employment was terminated because he was significantly older than Cieslak, McGowan and Reidy. Aetna's counsel urged the jury to find that the termination had nothing to do with age.

The jury was instructed as follows:

---

**1.** Cieslak testified: "I mean this was basically my decision on what I thought should happen, and [McGowan] had ... the final say. He could have overruled me on any of this. But I don't recall that happening." JA 442. Cieslak later testified that it would have been awkward for him to attend a retirement party for the plaintiff. Asked to explain why, he testified: "Because I made— you know, I made the decision, I terminated his employment. So I didn't—I kind of distanced myself from it." JA 469.

**2.** McGowan did not testify because he passed away before the trial. However, an affidavit that he signed in connection with a motion for summary judgment was admitted into evidence. The affidavit's explanation for the termination of the plaintiff's employment was generally consistent with Cieslak's.

**3.** Cieslak testified that he could not recall making that statement. JA 476.

To prevail on his claim of age discrimination, Mr. Zimmitti must prove, by a preponderance of the evidence, that the explanation given by the defendant for the termination of his employment is a pretext or cover-up for what was in truth age discrimination. In other words, he must prove by a preponderance of the evidence that Aetna's contention that he was not the best qualified candidate for the ... position is untrue and that he was not selected for the position because of his age. If the plaintiff proves that the defendant's explanation is a pretext or cover-up for age discrimination, you must find for the plaintiff. If, however, you find that the explanation given by the defendant is true, you must find for the defendant. If after considering all the evidence you find that Aetna's explanation is untrue, that does not necessarily mean that your verdict must be for the plaintiff. If you reject the defendant's explanation as untrue, you must still decide whether the real reason the plaintiff lost his job was age discrimination. If you find that the defendant's explanation is untrue, and you further find that the plaintiff lost his job due to age discrimination, then your verdict must be for the plaintiff.

After deliberating for a period of time, the jury asked for a copy of the charge relating to the ADEA. By agreement of the parties, the instructions just quoted were re-read. In due course, the jury returned a verdict in favor of the plaintiff. Responding to interrogatories, the jury found that the defendant terminated the plaintiff's employment because of his age in violation of the ADEA, that he was entitled to compensation in the amount of $175,000, and that the violation was not willful.

### III.

In its motion for judgment as a matter of law, the defendant contends that the jury's verdict must be overturned under *Fisher* because the evidence fails to establish a nexus between the termination of the plaintiff's employment and his age. The plaintiff responds that the evidence supports the jury's finding of pretext and that the pretext finding together with all the evidence in the record adequately supports the jury's determination that age was a factor in the termination.

 The jury's verdict may be overturned only if there is "such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer surmise and conjecture, *Norton v. Sam's Club*, 145 F.3d 114, 118 (2d Cir.1998) (quoting *Stratton v. Department for the Aging*, 132 F.3d 869, 878 (2d Cir.1997)), or if there is such an overwhelming amount of evidence in favor of the defendant that fair minded persons could not have arrived at th[e] verdict." *Stratton*, 132 F.3d at 879. The evidence must be viewed in a light most favorable to the plaintiff and he must be given the benefit of all reasonable inferences the jury could have drawn in his favor. *See Norton*, 145 F.3d at 118. The court is not entitled to "assess the weight of conflicting evidence, pass on the credibility of witnesses or substitute [its] judgment for that of the jury." *Id.* (quoting *Stratton*, 132 F.3d at 878). Judged according to this stringent test, which protects a party's right to trial by jury, the defendant's motion fails.

### Facts

The evidence, viewed most favorably to the plaintiff, and with all reasonable inferences drawn in his favor, permitted the jury to find the following facts.

At the time of his termination in 1991, the plaintiff was 55 years of age. He had worked for the defendant for 25 years, compiled a good performance record, been promoted and received merit bonuses. His position at the time he was terminated was administrator of retrospective rating in the service and technology unit of the national commercial accounts department

("the retro ratings unit"). *See* JA 1441. He had three supervisors reporting to him, each of whom supervised seven or eight employees. The retro ratings unit was responsible for preparing reports that calculated the premiums to be charged to Aetna's largest commercial accounts based on their loss experience.

The plaintiff held the administrator position from December 1986 until his termination in early 1991. During that time he was rated as meeting or exceeding the job's requirements. Before being promoted to the administrator's position, he had been a supervisor in the retro ratings unit. While serving in that capacity, he had received a rating of "significantly exceeds requirements," the highest possible rating at Aetna, which was seldom given to any employee. JA 1520.

The last annual evaluation the plaintiff received covered his performance for 1989. JA 1341. His supervisor at that time, Frank Lusk, was also in his 50's. Lusk gave the plaintiff ratings of "exceeding requirements" and "above average" in two of the three categories for which a rating was given and the plaintiff narrowly missed receiving an overall rating of "exceeding requirements" for the year. Lusk gave the plaintiff the highest possible ratings for production results, thoroughness and accuracy, problem analysis and decisionmaking. In addition, Lusk gave him the highest possible ratings for directing and leading others, managing change, selecting employees, developing and supporting employees and giving them performance feedback. JA 1348–50. The plaintiff had received similarly high ratings from Lusk the year before. JA 1506.

In October 1989, the plaintiff received a written commendation from the senior vice president of national accounts. JA 1528. The memorandum praised the plaintiff and his staff for exceeding previous production levels by 30 percent with 15 percent fewer staff. The memorandum attributed the unit's success to plaintiff's leadership, the support he enjoyed among the people who worked for him, and their teamwork. The following month, Lusk recommended that the plaintiff be given a bonus in recognition of "very favorable overall unit operations during 1989." JA 1530.

In April 1990, Peter McGowan took over as head of service and technology in the national commercial accounts department. He was 39 years of age, 16 years younger than the plaintiff. Shortly thereafter, a report based on a review of approximately 400 calculations done by the retro ratings unit, known as the I–90 Retro Report, presented data showing that the unit was having problems with timeliness and accuracy. JA 1360. A subsequent survey of four field offices showed that during a 30 day period the offices had to return reports prepared by the unit due to processing errors. JA 1357. These problems could be attributed to difficulty the unit had getting timely, accurate information from other departments such as underwriting.

McGowan adopted a "no excuses" policy for the unit, which established strict production standards for speed and accuracy. Under the new policy, 95 percent of the reports required to be done by the unit each month had to be done on time, and no more than 2 percent of them could be inaccurate. The unit adapted. By September 1990, a particularly busy time of the year, the unit got 98 per cent of its reports done on time.

In late August 1990, McGowan relieved Lusk of two of the four areas for which he had been responsible and assigned them to Walter Cieslak, who was 32. As a result, Cieslak replaced Lusk as the plaintiff's supervisor. Instead of reporting to an individual with whom he had worked for a number of years and who was slightly older, plaintiff was now reporting to a person he hardly knew who was 23 years younger.

Cieslak had other responsibilities and he devoted only part of his time to the retro

ratings unit. During the first few months of his tenure as the plaintiff's supervisor, he continued to use an office in another department. He visited the retro ratings unit from time to time, but not frequently, and very seldom spoke with the plaintiff by phone. JA 191. In late 1990, he took an office right next to the plaintiff's, but still spent most of his days elsewhere. JA 191–92. On occasion, he and the plaintiff talked about how the unit was meeting its production goals. However, their talks were brief and infrequent. JA 193–94.

In October 1990, Aetna announced the reorganization that would lead to termination of the plaintiff's employment. McGowan was selected to head up service and technology for national commercial accounts following the reorganization. McGowan relied on Cieslak to make recommendations regarding restructuring and staffing. Ultimately, four employees in the retro ratings unit were terminated in the reorganization, including the plaintiff.

Aetna's human resources department published guidelines for the reorganization. JA 1280. The guidelines were intended to foster objectivity and thereby reduce the risk of discrimination. JA 698–99. "Guiding principles" contained in the guidelines directed management to "[p]lace the best qualified people in the right jobs," use a "competency-based selection process," and "guard against adverse impact on protected classes of persons." JA 1284.

Under the guidelines, managers involved in restructuring and selecting staff were expected to follow a "progression of events." JA 1285. After determining the new organizational structure and number of staff needed, managers were supposed to select staff using "competency based position descriptions" and "update[d] employee competency assessments." *Id.* Staff selections were to be "document[ed]" using "competency comparison worksheets," *id.*, also known as "candidate comparison worksheets," which listed ten different "competencies," or "areas of knowledge, ability and skill." JA 1293–94. To complete the worksheet, it was first necessary to identify the "critical competencies" for the position (i.e. those "needed to be successful") and rate the relative importance of all the competencies. JA 1293. Each candidate then had to be rated with regard to each competency. To properly assess a candidate's "competencies," a manager was supposed to consider the most recent annual performance evaluation prepared by the employee's supervisor, known as a "Part III," *id.*, plus "other appropriate input (e.g., interview results, past appraisals, third-party assessment, evaluation of past work experience)." *Id.*[4]

The guidelines distinguished between positions in class 78 and above, which were officer level positions, and positions in or below class 34, like the plaintiff's, which was a class 33. To fill positions in or above class 78, managers were supposed to consider individuals on a "companywide basis," JA 1284, the goal being "to fill the positions with the best available candidates regardless of their previous positions and/or locations." JA 1287. On the other hand, when filling positions in or below class 34, "incumbents" were to be given a "preference." JA 1284. An "incumbent" was an employee "currently performing the same or virtually the same job." JA 1287. To qualify for the incumbent prefer-

---

4. The guidelines noted that staff selections could be required in any of the following situations: "change in staffing numbers, change in job functions, creation of new jobs, and a need for stronger performers." JA 1287. The guidelines stated that "competency assessments and candidate comparisons" would be required if "an incumbent [was] displaced by a more qualified candidate," a job was "new," or the functions of a job "changed materially," which was defined as "30% or more." JA 1288. In effect, this meant that if an incumbent was being retained in a position with no material change in job functions, competency assessments and candidate comparisons would not be required. Otherwise, they would be.

ence, employees had to be "meeting the requirements of their jobs." JA 1287.[5] In practical terms, the incumbent preference meant that if a position's functions were to remain essentially the same, the "most likely candidate" for the position in the new organization should be the individual who was already in the position. JA 1431.

It was the custom and practice at Aetna for an employee to provide his supervisor with a draft of an annual performance evaluation. The supervisor would then review the draft with the employee and make appropriate revisions. Any disagreement between the two would be discussed and the employee would have an opportunity to comment on the final draft before the evaluation became a part of his personnel file. Consistent with that custom and practice, the guidelines stated that "update[d] competency assessments" were to be "share[d] with employees" before candidate comparisons were done and selection decisions were made. JA 1285.

At McGowan's request, Ceislak developed a new organizational chart for the service and technology unit. *See* JA 1439. The chart included a position called "Senior Administrator, Retrospective Rating." This position was the same as the plaintiff's except that it had one "new report" in the form of a "business consultant" with expertise in automation. Cieslak intended to fill the "business consultant" slot by taking an employee from another unit who had frequently provided services to the

retro ratings unit with regard to automation. Moving the employee into the unit meant that the administrator position could be upgraded to a class 34. No other changes were made in the unit's management structure.

At some point, McGowan and Cieslak decided that Monica Reidy should be considered for the position of Senior Administrator. Reidy, who was working in another part of the company involved with national accounts, had told McGowan that if he ever had an opening in his organization, she would like to be considered for it.[6] Reidy and McGowan knew each other because she had reported to him eight years earlier when she was a supervisor in the retro ratings unit and he was the unit's administrator. Cieslak did not tell the plaintiff that Reidy was being considered for the position.

Aetna's human resources department required that completed Part III's for 1990 be turned in no later than February 15, 1991. On that date, Cieslak signed and submitted a Part III for the plaintiff without consulting Lusk. JA 601–02, 958. Cieslak's evaluation of the plaintiff's "competencies" included some positive comments but was generally unfavorable, particularly with regard to leadership and teamwork, the two competencies Cieslak had identified as the "critical competencies" for the Senior Administrator position. JA 1270.[7]

---

5. The guidelines also distinguished between situations involving "restructuring," which involved "creating a new entity through reengineering," and "situations involving staff reduction only where no restructuring/reengineering is occurring." JA 1287. In the first situation, candidates for positions in or below class 34 were to be considered in the following order: incumbents, non-incumbents at the same location who were better-qualified, candidates from other locations and outside hires. In the second situation, selections were to be made from among incumbents and candidates not currently performing the job were not supposed to displace incumbents. *Id.*

6. Reidy testified that she approached McGowan shortly after he took over as assistant vice president for service and technology.

7. With regard to the critical competency of leadership, Cieslak described the plaintiff as follows: "Has not consistently achieved production objectives. With manager intervention and controls, production objectives were achieved late in year. Can motivate staff at times to meet targets, but 'laid back' leadership style has often not been effective in completing projects quickly and accurately (e.g. Monthly Delinquency Report)." With regard to building teamwork, Cieslak stated on a positive note: "Communicates well with staff

Cieslak understood that his written evaluation depicted the plaintiff as not meeting the requirements of his job. *See* JA 464. However, Cieslak did not discuss the evaluation with the plaintiff. JA 644. Nor did he ever warn the plaintiff verbally or in writing that his performance was unsatisfactory. *See* JA 239. The plaintiff did not know his job was in jeopardy and assumed he would keep his job after the reorganization.

Shortly after signing plaintiff's Part III, Cieslak completed a candidate comparison worksheet for the Senior Administrator position. He rated six candidates, including the plaintiff and Reidy. JA 1271. Ceislak gave Reidy the highest overall rating. *Id.* The plaintiff got the lowest. JA 1272.

Using a scale of 1 to 5, with 1 being the lowest, Cieslak gave the plaintiff a rating of 2 with regard to six of the ten competencies, including leadership. These scores were tantamount to a rating of "not meeting requirements." *See* JA 655. With regard to the other four competencies, including building teamwork, he gave the plaintiff a rating of 3.

Reidy was given six 4's and four 3's. With regard to leadership, Cieslak gave her a rating of 4, which was significantly higher than the plaintiff's 2. The documentation for this rating consisted of the following comment in a draft Part III prepared by Reidy's supervisor: "Welcomes new ideas and solutions to resolve problems in support and procedures. She is committed to personal growth and to establishing environment in which subordinates can achieve personal growth." JA 1274. With regard to building teamwork, Cieslak gave Reidy another 4, which was higher than the plaintiff's 3. The documen-

tation for this rating consisted of the following comment by Reidy's supervisor: "Has developed good working relationships with peers and supervisors." *Id.*[8]

Aetna's candidate comparison worksheet required Cieslak to compare the candidates with regard to the critical competencies. JA 1271. In that section of the worksheet, Cieslak made the following statements. On the subject of leadership, he stated that Reidy had "strong leadership skills," as well as "demonstrated ability to inspire/motivate subordinates to consistently accomplish results." The plaintiff, in contrast, was said to "need more manager intervention/supervision in order to accomplish objectives." On the subject of building teamwork, Cieslak stated that Reidy had a "proven track record of developing competent staffs/teams to ensure customer needs are met," whereas the plaintiff "need[ed] to develop stronger relationships with customers." Summing up, Cieslak wrote that Reidy was a "strong match" for the position and that the plaintiff "lack[ed] the necessary leadership skills." JA 1271.

On March 4, 1991, Cieslak told the plaintiff that his position was being eliminated effective immediately. Cieslak handed the plaintiff a memo dated February 22, which began with the following notice: "As a result of changing business needs, job evaluations have begun. Your job is affected by these changes and will be eliminated March 4, 1991. This action is intended to be permanent."

Though the memo stated that the administrator's position was being eliminated, the plaintiff had heard a rumor that Reidy was taking over his job. JA 94. He

---

and has promoted a team approach within unit." However, he went on to say: "Needs to develop more effective working relationships with underwriting and field to ensure customer needs and SBU requirements are met. Needs to respond more quickly and accurately to inquiries from these areas." In the same document, Cieslak stated that the plaintiff had "not demonstrated [an] ability to

quickly adapt/respond to changes or problems" and that he needed to "facilitate necessary changes in the Rating unit more aggressively to support unit/department mission."

8. Reidy's supervisor did not sign the Part III until some time after Reidy was notified that she had been selected for the Senior Administrator position. *See* JA 1399.

asked Cieslak if the rumor was true and Cieslak said it was. *Id.*[9]

In mid-April 1991, the plaintiff called Cieslak to get attendance records and other documents he needed in order to try to get another position with the company, Plaintiff began the conversation by asking, "How's my replacement doing?" JA 100. Cieslak replied, "Overwhelmed." *Id.* When the plaintiff asked about getting a 1990 performance evaluation to assist in his job search, Cieslak said, "But I thought you were retiring." *Id.* Plaintiff, who could not afford to retire, had never indicated to Cieslak or anyone else at the company that he wanted to retire anytime soon.

Following his conversation with Cieslak, plaintiff filed a complaint of age discrimination.

## The Jury Was Entitled To Find That The Defendant's Explanation For Terminating The Plaintiff's Employment Was A Pretext

■ The issue on this remand is whether the evidence is sufficient to sustain the jury's finding that the plaintiff's employment was terminated because of his age in violation of the ADEA. However, before addressing that issue, it is necessary to consider whether the evidence is sufficient to support a finding of pretext.[10]

The parties disagree about whether the evidence permitted the jurors to find that the explanation the defendant gave them for terminating the plaintiff's employment was a pretext. In its principal memorandum, the defendant contends that the evidence plaintiff relies on constitutes no more than a "weak showing of pretext." Def.'s Mem. at 16. That statement could be interpreted as a concession that the evidence, although weak, is marginally sufficient. However, in its reply memorandum, the defendant states that a reasonable juror could not find its articulated nondiscriminatory reason to be unworthy of belief. Def.'s Reply Mem. at 3 n. 2. The plaintiff, in contrast, contends that he readily discharged his burden of proving that the defendant's explanation was untrue.

The jury's finding that the plaintiff's employment was terminated because of his age makes it clear that the jurors did not credit Cieslak's testimony regarding the termination. The question with regard to the issue of pretext is whether they were entitled to disbelieve him. Viewing the evidence fully and most favorably to the plaintiff, I think they were.

The thrust of Cieslak's testimony was (1) that he gave careful consideration to all the candidates for the Senior Administrator position in compliance with Aetna's guidelines for the reorganization; (2) that he recommended Reidy for the position because she was clearly better qualified than the plaintiff; and (3) that the plaintiff was not qualified for the position, as demonstrated by his performance in 1990, which was not satisfactory.

■ Taking each of these points in order, Cieslak's testimony that he gave each candidate careful consideration in compliance with the guidelines could reasonably be rejected by the jury.[11] Viewing the evidence most favorably to the plaintiff,

---

9. Reidy testified that she knew she was being considered for the position 3 to 6 weeks before she got it. JA 745, 797.

10. "We attach the label 'pretext' to a proffered reason that is not credited by the finder of fact." *Fisher,* 114 F.3d at 1337.

11. Failure to follow an organization's stated policies or routine procedures can be evidence of pretext. *See Stern v. Trustees of Columbia Univ.,* 131 F.3d 305, 313 (2d Cir.

1997) ("[w]hile we do not second-guess an employer's hiring standards, the reasons for its employment decision, including its alleged reliance on such standards, are subject to scrutiny under Title VII, and '[d]epartures from procedural regularity,' for example, 'can raise a question as to the good faith of the process where the departure may reasonably affect the decision' ") (quoting *Zahorik v. Cornell University,* 729 F.2d 85, 93 (2d Cir. 1984)).

the jury could find that although the guidelines required Cieslak to guard against adverse impact on the plaintiff as a member of a protected group, he did not do so.[12] The jury could find that Cieslak failed to give the plaintiff the benefit of an incumbent preference.[13] In addition, the jury could find that Cieslak put the plaintiff at a disadvantage by completing the plaintiff's Part III for 1990 without consulting Lusk concerning the plaintiff's performance during the first eight months of the year.[14] Further, the jury could find that he should have discussed his unfavorable assessment of the plaintiff's competencies with the plaintiff before relying on it to document his decision to terminate the plaintiff's employment.[15]

Turning to Cieslak's testimony that Reidy was clearly better qualified than the plaintiff, the plaintiff acknowledged that Reidy was qualified, and it was not the defendant's burden to prove that she was better qualified. Nevertheless, in assessing the credibility of Cieslak's explanation for the termination of the plaintiff's employment, the jury could reasonably find that Reidy's qualifications for the Senior Administrator position were not clearly superior to the plaintiff's, as Cieslak claimed, and that the plaintiff's qualifications were competitive with hers' or even better.

█ These findings would be permissible because Cieslak's comments on the candidate comparison worksheet regarding Reidy's competencies are both highly subjective and conclusory, *see* JA 1271;[16] the draft Part III Cieslak obtained from Reidy's supervisor, JA 1273–74, falls far short of documenting clear superiority with regard to the critical competencies of leadership and building teamwork;[17] and,

12. Cieslak testified that he was not responsible for guarding against adverse impact on members of protected groups and that the responsibility lay with people at a higher level. JA 636–37. However, the guidelines do not say that. *See* JA 1284. Moreover, because the obligation to guard against such adverse impact was one of the "guiding principles of restructuring" given to the managers involved in making staff selections, *id.*, the jury could reasonably find that the obligation applied to Cieslak.

13. It is undisputed that the plaintiff did not get the benefit of an incumbent preference. On cross-examination, Cieslak initially had some difficulty recalling why. *See* JA 618–20. After reading the pertinent guidelines, he asserted that no preference was given because the plaintiff was not meeting the requirements of his job and the Senior Administrator position was a new position. JA 620–25. The jury could reasonably find that the plaintiff's performance was adequate, that the job functions of the Senior Administrator's position were the same or virtually the same as the job functions of the plaintiff's position and, accordingly, that he should have been given the incumbent preference. Such a finding would provide support for the plaintiff's claim, even if the incumbent preference was not a guarantee of continued employment. *See Gallo v. Prudential Residential Services, LP*, 22 F.3d 1219, 1227–28 (2d Cir.1994) (failure to consider laid off employee for position like one she previously performed, despite policy manual provision requiring that laid off employees receive priority consideration, supported age discrimination claim).

14. Cieslak acknowledged that employees were to be evaluated with regard to meeting performance objectives on the basis of their performance over the course of a year, rather than on the basis of a shorter period of time. JA 677.

15. As mentioned previously, the guidelines contemplated that managers would update competency assessments and discuss them with employees before using them to make staff selections, a procedure that was consistent with Aetna's usual personnel practices with regard to annual performance evaluations.

16. Subjectivity in an employee evaluation provides an insufficient basis for challenging the evaluation as discriminatory. *Walton v. McDonnell Douglas Corp.*, 167 F.3d 423, 428 (8th Cir.1999). However, "[o]bjective criteria should be used to the maximum extent possible, and a subjective system must be carefully scrutinized for abuse." *Nicholas v. Nynex, Inc.*, 974 F.Supp. 261, 267 (S.D.N.Y.1997).

17. A "risk assessment checklist" prepared by Aetna in connection with the reorganization recognizes that weaknesses in the documentation for a staff selection are cause for concern. The checklist asks: "Does the documentation present a convincing argument

although the defendant contended that Reidy was better qualified for the Senior Administrator position because of her background with computer systems, Cieslak admitted that he "wasn't really sure of her [computer] background." JA 401. Moreover, the plaintiff had consistently earned the highest ratings for leadership and building teamwork; he had received a letter of commendation and a performance bonus just the year before based on his leadership and the teamwork of his staff; and he had actually performed the functions of the administrator's job for more than four years, whereas Reidy had never held the position. In evaluating Cieslak's testimony, the jury could also consider his statement six weeks after Reidy took over the plaintiff's position that she was "overwhelmed."

■ Cieslak's testimony concerning his evaluation of the plaintiff's qualifications also presented a credibility issue for the jury to resolve.[18] Viewing the evidence most favorably to the plaintiff, the jury could find that Cieslak's evaluation of the plaintiff's competencies, which depicted the plaintiff as a "poor" performer, JA 464, was so wide of the mark as to be pre-

textual. The jury could find that in previous years the plaintiff had consistently accomplished production objectives under Lusk; that his production objectives in 1990 were accomplished to Lusk's satisfaction before Cieslak arrived in the unit in late August; that the plaintiff effectively managed the unit's transition to the "no excuses" policy before Cieslak arrived; that Cieslak overstated the degree of "manager intervention/supervision" he brought to bear thereafter; and that the plaintiff had been notably successful at developing teamwork.

These findings would be permissible because the evidence presented to the jury included not just the plaintiff's conclusory testimony concerning his qualifications, which alone would be insufficient.[19] The plaintiff also had the benefit of Lusk's testimony, which was significant. Lusk testified that the plaintiff consistently performed up to the standards and expectations that had been established for him right up until the time Cieslak took over as the plaintiff's supervisor in late August 1990. JA 953–54, 955.[20] Lusk's testimony could be viewed as refuting Cieslak's statement in the plaintiff's Part III for

that the selection was competency-based?" JA 1588.

18. A jury does not sit as a super-personnel committee to second-guess business decisions, and an employee's disagreement with his employer's assessment of his qualifications is insufficient to create a triable issue of pretext. See Scaria v. Rubin, 117 F.3d 652, 654 (2d Cir.1997). However, comparative proof regarding employee qualifications is generally admissible in employment discrimination cases to establish pretext, Gibson v. American Broadcasting Companies, Inc., 892 F.2d 1128, 1133 (2d Cir.1989), and one way of demonstrating that an employer's explanation is pretextual is "to show that the asserted neutral basis was so ridden with error that [the employer] could not honestly have relied upon it." Lieberman v. Gant, 630 F.2d 60, 65 (2d Cir.1980) (Friendly, J.). See also Danzer v. Norden Systems, Inc., 151 F.3d 50 (2d Cir. 1998) (plaintiff's affidavit sufficient to withstand motion for summary judgment based on employer's claim that plaintiff picked for downsizing due to poor performance).

19. See Chertkova v. Connecticut General Life Ins. Co., 92 F.3d 81, 93 (2d Cir.1996) (plaintiff "presented enough evidence to justify the belief that her performance ... was wholly adequate or even superior ... includ[ing] not only her own affidavit, but also affidavits and deposition testimony of other employees").

20. Lusk's testimony was consistent with his 1989 evaluation of the plaintiff; the letter of commendation the plaintiff received for his performance in 1989 from the highest ranking officer in the unit; and the performance bonus he received for 1989 in recognition of "very favorable overall unit operations" that year. In addition, the jury was given a chart showing the results of the unit's operations. See JA 1347. The chart shows that in 1989, 98% of the units calculations were "complete on time" and that only 2% of them contained errors "due to rating." See Part I, lines D and K.

1990 that the plaintiff failed to meet his production objectives until late in the year.[21] In addition, Cieslak admitted that the unit achieved "tremendous" results under the "no excuses" policy as early as September 1990, which was right after he took over for Lusk. The jury could reasonably infer that Cieslak arrived too late to make any difference in the unit's operations in September. Crediting the plaintiff's testimony that his contact with Cieslak was limited and infrequent, the jury also could conclude that the plaintiff was entitled to far more credit for the unit's success in meeting the "no excuses" policy during the rest of the year.[22] In addition, the jury could give significant weight to the letter of commendation the plaintiff received just the year before from McGowan's predecessor praising him for his leadership and the teamwork of his staff.[23]

The jury's pretext finding is also supported by Cieslak's initial explanation to the plaintiff in the termination conference that his position was being eliminated.[24] Viewing the evidence most favorably to the plaintiff, the jury could find that Cieslak's initial explanation was not truthful because, although the defendant characterized the Senior Administrator position as "new" and put it in class 34, rather than class 33, the functions of the position were essentially the same as the functions of the plaintiff's position.[25] The jury could find that the addition of the "new report" with expertise in automation did not constitute a material change in the functions of the administrator's position because the plaintiff testified that he had worked with such a consultant for two years before the reorganization and Lusk testified that he was not aware of any changes in the position after the reorganization. JA 964. Moreover, Cieslak admitted that when the plaintiff asked him in the termination conference whether Reidy was getting the position, he confirmed she was, and when the plaintiff called him six weeks later and asked "How's my replacement doing?" he replied, "Overwhelmed." Viewing the evidence of those two conversations most favorably to the plaintiff, the jury could find that on both occasions Cieslak tacitly ad-

21. Cieslak acknowledged that Lusk was responsible for determining whether the plaintiff met his performance objectives through the first eight months of the year. JA 650. Moreover, the jury could find that Cieslak's criticism of the plaintiff's performance before September 1990 was based on retroactive application of the "no excuses" policy, which was not announced until sometime after April 1990.

22. Cieslak testified that the "no excuses" policy was met only with his "active involvement." JA 649. However, the jury could find that he was involved with the plaintiff's unit only on a part-time basis and that his involvement consisted of sporadic conversations with the plaintiff.

23. In assessing the plaintiff with regard to building teamwork, Cieslak acknowledged the plaintiff's success at building teamwork within the unit but faulted him for not developing "more effective working relationships with underwriting and field to ensure customer needs and SBU requirements are met." The jury could find that Cieslak's negative comment was based on retroactive application of the "no excuses" policy, which placed greater emphasis on more effective interaction be-

tween the unit and other departments than had been the case before.

24. Inconsistent explanations for a challenged employment action can be evidence of pretext. *See EEOC v. Ethan Allen, Inc.*, 44 F.3d 116, 120 (2d Cir.1994). An employer who tells an employee that his position has been eliminated in a reduction in force risks a pretext finding if the employer later asserts in response to a discrimination claim that the discharge was actually motivated by the employee's performance. *See Rhodes v. Guiberson Oil Tools*, 75 F.3d 989, 995–96 (5th Cir. 1996) (in banc).

25. The parties agree that under the guidelines for the reorganization the test for determining whether a job changed is whether the functions of the job changed. The same is true under the law. *See Burger v. New York Institute of Technology*, 94 F.3d 830, 835 (2d Cir. 1996) ("We have stressed that the similarity of the jobs held by an older and younger employee is the touchstone for determining whether a lay-off of the older may be found to be an ADEA violation by a trier of fact").

mitted that the Senior Administrator position really was not a new position and that the plaintiff had been displaced by Reidy.

The jury's pretext finding is also supported by Cieslak's statement to the plaintiff, "But I thought you were retiring." The jury could reasonably interpret Cieslak's statement as a spontaneous utterance revealing his true state of mind with regard to the plaintiff generally. Interpreting the statement in a manner most favorable to the plaintiff's ADEA claim, the jury could infer that from the inception of the reorganization Cieslak had mistakenly assumed that the plaintiff wanted to retire and that this error had affected his perception and treatment of the plaintiff.

In light of all this, the defendant's argument that a reasonable juror would have to credit its explanation for the termination of the plaintiff's employment is untenable. Reasonable people assessing the credibility of the explanation provided by Cieslak could reach differing conclusions. Accordingly, the jury's pretext finding must be sustained.

### The Evidence is Sufficient to Support the Plaintiff's Claim That He was Terminated Because of His Age

As noted at the outset, *Fisher* makes it clear that a sustainable finding of pretext does not necessarily entitle a plaintiff to prevail. In the context of a Rule 50 motion after a jury verdict in favor of the plaintiff, a sustainable pretext finding means that the defendant's asserted reason for the challenged employment action was not supported by overwhelming evidence. However, the jury's verdict is still vulnerable if there is such a complete absence of evidence of discrimination that the jury's finding of discrimination could only have been the result of surmise and conjecture. *See Stratton,* 132 F.3d at 878.

Cases decided by the Second Circuit since *Fisher* show that a jury will not be permitted to infer discrimination "from thin air," *see Norton,* 145 F.3d at 119, or "on the basis of circumstantial evidence that has no logical tendency to show that discrimination was present." *Pollis v. New School for Social Research,* 132 F.3d 115, 123 (2d Cir.1997). But if the evidence supports a pretext finding and the record as a whole permits the inference that the plaintiff was treated unfavorably because of discrimination, a jury's verdict will not be disturbed. *See Banks v. Travelers,* 180 F.3d 358, 1999 WL 298231 (2d Cir. May 12, 1999) (trial court's denial of employer's motion to overturn jury verdict affirmed) *see also Stratton* (same).

The facts of this case are similar to the facts in *Banks* and *Stratton* in numerous significant respects: (1) there is a wide disparity in age—the plaintiff is 23 years older than Cieslak, 15 years older than McGowan and 14 years older than Reidy; (2) a significant downturn in the plaintiff's performance evaluations coincided with the arrival of new, substantially younger management—in a span of a few months, the plaintiff went from meeting or exceeding the requirements of his job to not meeting requirements; (3) the jury could reasonably find that the plaintiff was as or better qualified than the much younger person who replaced him; (4) the jury could reasonably find that the plaintiff was not given serious consideration for his own position, even though he had discharged the duties of the position to the satisfaction of previous management for a number of years and was entitled to an incumbent preference; (5) the jury could reasonably find that written evaluations were prepared to create the illusion that the plaintiff was given equivalent consideration and to rationalize a decision based in part on age; (6) the challenged decision resulted from a process that allowed bias to seep in—here, competency assessments and candidate comparisons that are highly subjective and conclusory in nature; and (7) the decisionmaker made an age-related comment that could be interpreted as an admission regarding his motivation for terminating the plaintiff's employment—here,

Cieslak's comment, "But I thought you were retiring."[26]

These factors, together with the pretext finding, provide a sufficient basis for sustaining the jury's verdict because they permit the inference that age was a substantial factor in the termination of the plaintiff's employment. Viewing the evidence most favorably to the plaintiff, the jury could find that Cieslak mistakenly believed, based on age-related stereotypes, that the plaintiff was no longer motivated to work and wanted to retire.[27] The jury could find that Cieslak's mistaken view of the plaintiff played a role in his decision-making. Ultimately, the jury could conclude that if the plaintiff had been evaluated on the merits without regard to his age,

his qualifications and experience together with the incumbent preference would have enabled him to keep his position.[28] Such disparate treatment "captures the essence of what Congress sought to prohibit in the ADEA." *Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993).[29]

The defendant contends that none of the pieces of evidence relied on by the plaintiff points to age as a factor in the termination of his employment. However, the wide disparity between the plaintiff's age and the ages of Cieslak, McGowan and Reidy points to age, *see Banks,* 180 F.3d 358, 366, as does Cieslak's statement "But I thought you were retiring."[30] Moreover,

26. *Compare, Raskin v. Wyatt Co.,* 125 F.3d 55, 63 (2d Cir.1997) (decisionmaker's comment while interviewing plaintiff about his possible interest in position that plaintiff might not be interested because of his age did not provide basis for discrimination claim; comment did not show that age was a substantial factor in subsequent selection of another younger manager and decisionmaker did not indicate surprise or disbelief when plaintiff said he was interested in the position).

27. "[A] mistake that reflects a stereotype is very likely to have derived from that stereotype and so be a telltale sign of discrimination." Rosen and Freiman, *Remodeling McDonnell Douglas: Fisher v. Vassar College and the Structure of Employment Discrimination Law,* 17 Quinnipiac L.Rev. 725, 769 (1998).

28. The plaintiff contends that the jury's verdict is also supported by Cieslak's comments on the plaintiff's Part III for 1990 that the plaintiff lacked aggressiveness and was laid back, which the plaintiff views as "stereotypical"; by a reduction in the average age of the employees in the unit as a result of the reorganization; and by evidence that a younger employee, John Arcidiacono, received preferential treatment. The defendant argues with some force that Cieslak's comments do not support an inference of age discrimination; that the size of the unit is too small to permit any reasonable inferences to be drawn from a reduction in the average age of the employees; and that plaintiff's argument with regard to Arcidiacono is foreclosed in whole or substantial part by Judge Covello's ruling granting summary judgment to the defendant on plaintiff's claim that he should have been

placed in another position. Resolving the parties' disagreement with regard to these points is unnecessary because other evidence is sufficient to support the jury's verdict.

29. As the Supreme Court noted in *Hazen,* the age discrimination that prompted Congress' promulgation of the ADEA "'rarely was based on the sort of animus motivating some other forms of discrimination, it was based in large part on stereotypes unsupported by objective fact ....'" 507 U.S. at 610, 113 S.Ct. 1701 (quoting *EEOC v. Wyoming,* 460 U.S. 226, 231, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983)). Thus, to prove a violation of the ADEA, the plaintiff did not have to prove that Cieslak terminated his employment because of a desire to not associate with older workers. Nevertheless, the plaintiff's testimony concerning the limited, infrequent nature of his contact with Cieslak suggests that Cieslak did not feel comfortable with the plaintiff and the jury might well have inferred that this was due in part to the wide age difference between them.

30. The defendant contends that Cieslak's comment is merely a stray remark with no probative value because Cieslak was not the ultimate decisionmaker and the comment was not made as part of the termination process. However, Cieslak testified that he made the decision to terminate the plaintiff's employment, the comment at issue was made just six weeks after the plaintiff was terminated, and Cieslak made the comment in a business call in response to the plaintiff's request for documents he needed to try to get another position at Aetna.

defendant's piecemeal approach to assessing the sufficiency of the evidence has been rejected by the Second Circuit. *See Stern,* 131 F.3d at 314 ("[T]he dissent considers the record solely in piecemeal fashion, proffering innocent explanations for individual strands of evidence. The jury, however, [is] entitled to view the evidence as a whole in assessing whether there was impermissible discrimination and whether [defendant's] proffered explanation is a pretext for that discrimination."); *see also, Danzer v. Norden Systems, Inc.,* 151 F.3d 50, 56 (2d Cir.1998) (though "stray remarks" and "sudden and unexpected downturns in performance reviews cannot, by themselves, provide the basis for a discrimination action" they may "nonetheless work with other submitted proofs ... to support a jury verdict of discrimination").

The defendant contends that the jury's finding of pretext does not point to age discrimination as the reason for the plaintiff's termination because the record discloses a third motive—personal favoritism. Picking up on a statement in plaintiff's brief on appeal, the defendant suggests that Reidy might have been chosen simply because McGowan wanted to be reunited with her in the retro ratings unit. This explanation does not provide a basis for overturning the jury's verdict because it was not advanced by the defendant at trial,[31] and is not supported by the record.[32] Moreover, the jury could reasonably find that the plaintiff's age was a substantial factor in the termination of his employment, even if McGowan was inclined to favor Reidy from the outset for personal reasons.[33] For example, the jury could find that Cieslak accommodated McGowan's personal preference for Reidy, notwithstanding the guidelines' preference for incumbents and the company's concern about adverse impact on employees in protected groups, because he mistakenly believed that the plaintiff was retiring and would not contest the matter. In that scenario, "if we asked [Cieslak] at the moment of the decision what [his] reasons were and if we received a truthful response, one of those reasons would be that [the plaintiff was retiring]." *Price Waterhouse v. Hopkins,* 490 U.S. 228, 250, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) (plurality opinion).[34]

## IV.

Accordingly, the defendant's motion for judgment as a matter of law is hereby denied.

---

31. *See Stratton,* 132 F.3d at 880–81 (defendants never argued at trial that there was a third motive for their actions so there was no basis for the jury to conclude that there was any motivation for the pretext other than discrimination).

32. There is no evidence that McGowan preselected Reidy for the Senior Administrator position and Cieslak denied that he had his mind made up before he compared the candidates for the position. JA 602.

33. *See Hagelthorn v. Kennecott Corp.,* 710 F.2d 76, 82–84 (2d Cir.1983) (plaintiff not required to prove that age was the only reason for his termination; evidence of defendant's dissatisfaction with plaintiff's performance not so overwhelming that fair minded jurors could only have concluded that plaintiff would have been fired regardless of his age).

34. The defendant's belated reliance on the "third motive" of personal favoritism is unpersuasive for another reason as well. In *Fisher,* the in banc majority observed that an employer may give a false reason for terminating an employee in order to mask a true reason that would be embarrassing although not unlawful. If the true reason for the challenged action in this case was McGowan's personal preference for Reidy, it is difficult to understand why Cieslak would not offer that reason to the jury rather than give a false reason under oath.