Thomas **BOMBERO**, Plaintiff,

v.

**WARNER–LAMBERT CO.**, Defendant.

No. 3:97 CV 2083(RNC).

United States District Court, D. Connecticut.

April 25, 2000.

William B. Barnes, Rosenstein & Barnes, Fairfield, CT, for Thomas Bombero, plaintiff.

Patrick W. Shea, Paul C. Marazita, Paul, Hastings, Janofsky & Walker, Stamford, CT, for Warner–Lambert Co., defendant.

## RULING AND ORDER

CHATIGNY, District Judge.

Plaintiff brings this case under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621–634 (1994) ("ADEA"), against defendant Warner–Lambert Company. Plaintiff was working for defendant on a temporary basis when a full-time position became available. He applied for the position but was not interviewed, On learning that the position had been given to a younger applicant, he filed a discrimination complaint with the Connecticut Commission on Human Rights and Opportunities. Shortly thereafter, his temporary assignment with defendant was terminated. Plaintiff claims that he did not get the full-time position because of his age and that his temporary assignment was terminated because he complained to the CHRO. Both sides have completed discovery and defendant has moved for summary judgment. After careful review of the voluminous record, I conclude that the evidence is insufficient to permit a jury to infer that defendant's actions were motivated by age discrimination or retaliation. Accordingly, defendant's motion for summary judgment is granted.

### I. *Facts*

The parties' Local Rule 9(c) statements, depositions and affidavits show that there are no genuine issues of material fact. Plaintiff, who was born in 1932, has worked for many years as a mechanical engineer designing automated machinery. At all times pertinent to this case, he was

an employee of Russo Associates, a temporary employment agency, which provided defendant with technical personnel.[1] In February 1994, Russo assigned plaintiff to defendant's Schick Wilkinson Sword facility to work in the Automation Systems group headed by Paul Schaefer. The Automation Systems group needed design support for a project known as "Brickpack." Schaefer, who was born in 1949, reviewed plaintiff's resume and approved of his retention as a contract engineer.

During the course of his work on the Brickpack project, plaintiff reported to Ilya Nizker, a senior project engineer, who was in his mid–40's. Plaintiff's work on the project required him to use computer aided design ("CAD") technology, which enables engineers to draw designs directly onto a computer.[2] It is undisputed that the engineers in the Automation Systems group did not use drafting boards; everything was done with computers. Plaintiff had no experience with CAD, so it was necessary for Russo and defendant to provide him with training. Plaintiff's CAD skills improved with training. However, during the course of plaintiff's work on the Brickpack project, Nizker criticized plaintiff's CAD drawings. *See* Pl.'s Dep. at 46.

In June 1994, plaintiff's services were no longer needed on the Brickpack project. Schaefer extended plaintiff's assignment by putting him to work on another project, known as "Tracer/FX." While working on that project, plaintiff reported to Jean Moulder, who was in his early 60's. Plaintiff had known Moulder for 50 years and the two developed a close working relationship on the Tracer/FX project.

In May 1995, plaintiff spoke with Moulder about the possibility of working directly for defendant through his own company, Hi–Speed Automation. Plaintiff's contract with Russo contained a restrictive covenant prohibiting him from accepting employment directly or indirectly at the client company for a period of six months following termination of his employment with Russo. (Def.'s Mem. Ex. B.) Plaintiff did not tell Moulder about this restrictive covenant. After speaking with Schaefer, Moulder informed plaintiff that he could work through Hi–Speed.

Plaintiff sent Russo a note stating that he was leaving Russo's employ. The note did not mention that plaintiff was planning to continue to work for defendant. Russo responded by calling plaintiff and asking if that was his plan. (Pl.'s Dep. at 353–54.) On learning that it was, Russo sent Schaefer a letter complaining about the proposed arrangement and threatening to sue for tortious interference with contract if the situation was not rectified. (Def.'s Mem. Ex. I.) Schaefer met with plaintiff, stated that Russo's letter made him very unhappy and instructed plaintiff to resolve the issue with Russo or leave defendant's workplace. Plaintiff resolved the issue by dropping his attempt to work for defendant through Hi–Speed.[3]

---

1. Such temporary employment agencies are referred to as "job shops."

2. Defendant has described CAD as "the language used by Warner–Lambert engineers to translate their ideas into recognizable form and to communicate them." (Def.'s Reply Mem. at 3.)

3. Plaintiff's deposition testimony concerning the Hi–Speed incident shows that he was aware of the restrictive covenant, Pl.'s Dep. at 81; thought it was illegal and had previously asked Russo to take it out but Russo had refused, *id.* at 81–83; was prepared for Russo to react as it did, *id.* at 81; would have warned Schaefer and Moulder about the potential for a dispute with Russo if they had asked him, *id.* at 84, but didn't "bring up any subjects that nobody asked [him] about," *id.* at 71; and "didn't tell [them] whether it was okay or whether it wasn't okay." *See Id.* at

A few months later, a full-time position for a project engineer became available in the Automation Systems group and a job opening form was posted. The posted form contained a "position summary," which stated that the successful candidate for the position would "plan and perform engineering design, and other technical and administrative tasks involved in the concept, development, and installation of equipment for high volume production." The posted form stated that the candidate would have to have a "B.S. degree [in] mechanical engineering [and] 3–5 years project engineering experience in the design, building and debugging of high-speed automatic assembly equipment." (Def.'s Mem. Ex. J.)

The "position summary" set forth in the posted notice was excerpted from a much more detailed position description. (Schaefer Aff. Ex. 4). The detailed description shows that the position entailed ten "essential functions," and required "continual communications with all levels of Engineering, Quality Control, Manufacturing, Marketing and Sales," plus "contact and liaison with outside vendors regarding manufacturing processes and equipment," and use of "computers." *Id.*

Plaintiff saw the posted form and decided to apply for the position. He submitted a resume to defendant's human resources department. The resume was given to Schaefer, who discussed it with Moulder and Nizker. As an external candidate, plaintiff was not automatically entitled to an interview and Schaefer decided not to interview him.[4]

In November 1995, the project engineer position was given to Robert McCormack, a 30–year old mechanical engineer, who had worked in defendant's Process Engineering group as a contract engineer from March 1992 to November 1994. Schaefer had become acquainted with McCormack on a casual basis during that 32 month period and Carl Hultman from the Process Engineering group gave McCormack a very favorable recommendation. (Schaefer Aff. ¶ 10.)[5]

During the time plaintiff was assigned to the Automation Systems group, the number of contract workers in the group was reduced due to a decline in workload. As of early December 1995, only three contract engineers remained with the group and Schaefer anticipated that only two would be needed beyond the end of the year. Of the three, plaintiff had the shortest tenure and least amount of work.

On December 5, 1995, Moulder submitted a workload report to Schaefer showing that there were 36 days of work remaining for plaintiff on the Tracer/FX project. Based on that report, Schaefer decided to extend plaintiff's assignment beyond the end of the year. On January 22, 1997,

---

87. Plaintiff admits that in the wake of Russo's letter to Schaefer, Moulder said that "he was unhappy about being put in the middle of this," and may have said that he was unhappy that plaintiff had not informed him in advance about the restrictive covenant. *See id.* at 75. Plaintiff further admits that Schaefer called him into his office, told him Russo's letter made him "very unhappy," *id.* at 80, and ordered him to "make peace with Russo or leave." *Id.* at 85. Plaintiff has testified that during his assignment with the Automation Systems group, he had only very limited interaction with Schaefer and that he "got

more office time with him [in connection with the Hi–Speed incident] than in the rest of [his] stay with Schick." *Id.* at 122.

4. Schaefer has testified without contradiction that he consulted with Moulder and Nizker about plaintiff's interest in the position and the three decided he was not qualified. Schaefer Aff. ¶ 6; *see also* Def.'s Local Rule 9(c) Statement ¶ 12 and Pl.'s Reply.

5. McCormack was also related to a foreman at defendant's Schick Wilkinson Sword facility.

Moulder reported that there were 10 days of work remaining for plaintiff on the project.

On January 22, 1997, plaintiff filed a complaint with the CHRO alleging that he had not been hired for the full-time position due to age discrimination. Nine days later, defendant received a copy of the complaint. This was its first notice that a complaint had been filed.

On February 12, 1997, Moulder gave plaintiff two weeks notice that his assignment as a contract engineer would be terminated effective February 23. Plaintiff asked Moulder if he knew that a complaint of age discrimination had been filed with the CHRO and Moulder replied that he did not. As of that date, the project plaintiff was working on was up and running, although there were still some corrections and changes to be done.

Only two contract engineers remained in the Automation Systems group after plaintiff left. One was in his mid–50's and the other was over the age of 70.

## II. *Applicable Law*

### A. *Summary Judgment*

The standard for summary judgment under Fed.R.Civ.P. 56 is well settled. A defendant seeking summary judgment has the burden of demonstrating that a trial is unnecessary because the evidence is insufficient to sustain a verdict for the plaintiff, who would bear the burden of proof at trial. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In determining whether there are any triable issues of fact, the evidence must be viewed fully and favorably to the party opposing summary judgment. *See Stern v. Trustees of Columbia University,* 131 F.3d 305, 313–14 (2d Cir.1997). The court must draw inferences in favor of the nonmovant provided they are permissible under the controlling substantive law. *See Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (evidence of price-cutting, which is no less consistent with lawful competition than with illegal conspiracy, does not, standing alone, support an inference of antitrust conspiracy).

### B. *Age Discrimination*

The ADEA makes it unlawful for an employer "to fail or refuse to hire ... any individual ... because of such individual's age." 29 U.S.C. § 623(a)(1) (1994). In a disparate treatment case,

> liability depends on whether the protected trait (under the ADEA, age) actually motivated the employer's decision. The employer may have relied upon a formal, facially discriminatory policy requiring adverse treatment of employees with that trait. Or the employer may have been motivated by a protected trait on an ad hoc, informal basis. Whatever the employer's decisionmaking process, a disparate treatment claim cannot succeed unless the employee's protected trait actually played a role in that process and had a determinative influence on the outcome.

*Hazen Paper Co. v. Biggins,* 507 U.S. 604, 610, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993) (citations omitted).

In the Second Circuit, age discrimination claims are analyzed using the three-step structure established by the Supreme Court for Title VII claims in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), and *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 515–16, 113

S.Ct. 2742, 125 L.Ed.2d 407 (1993). *See Hollander v. American Cyanamid Co.*, 172 F.3d 192, 198–99 (2d Cir.), *Cert. denied*, 528 U.S. 965, 120 S.Ct. 399, 145 L.Ed.2d 311 (1999). Plaintiff has the initial burden of establishing a prima facie case of discrimination. His burden in that regard is "minimal," *St. Mary's*, 509 U.S. at 506, 113 S.Ct. 2742, and "not onerous," *Burdine*, 450 U.S. at 253, 101 S.Ct. 1089. Establishing a prima facie case "in effect creates a presumption that the employer unlawfully discriminated against the employee." *Id.* at 254, 101 S.Ct. 1089. If plaintiff sustains the minimal burden of establishing a prima facie case, the burden shifts to the defendant to rebut the prima facie case by articulating some legitimate, nondiscriminatory reason for its action. *See Id.* If defendant proffers such reasons, the presumption of discrimination arising from the prima facie case "drops from the case," *St. Mary's*, 509 U.S. at 507, 113 S.Ct. 2742 (quoting *Burdine*, 450 U.S. at 255 n. 10, 101 S.Ct. 1089), and plaintiff bears the burden of proving that the proffered reasons are more likely than not a pretext or cover up for intentional discrimination. *Id.* at 511 & 517, 113 S.Ct. 2742; *see also Fisher v. Vassar College*, 114 F.3d 1332, 1339 (2d Cir.1997) (en banc), *cert. denied*, 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998).

### 1. Prima Facie Case

■ To establish a prima facie case, plaintiff must show that at the time of the challenged action he was: 1) in the protected age group; 2) qualified for the position at issue; 3) not hired for the position; and 4) denied the position in circumstances giving rise to an inference of age discrimination. *See Hollander*, 172 F.3d at 199. Defendant contends that plaintiff cannot establish the second element.

Plaintiff contends that he was qualified for the project engineer's position because he met the posted criteria for the position, is a gifted designer with vast experience, holds a number of patents, and earned praise from Schaefer and others while working in the Automation Systems group. Defendant contends that plaintiff was not qualified because he was not proficient in CAD.

■ To establish the second element of a prima facie case, plaintiff need not prove that he was better qualified than McCormack. Rather, he need make only a "minimal showing of qualification." *Owens v. New York City Hous., Auth.*, 934 F.2d 405, 409 (2d Cir.1991). Crediting plaintiff's deposition testimony concerning his qualifications, he has sustained his minimal burden of showing that he was qualified for the position for purposes of establishing a prima facie case.

### 2. Defendant's Proffered Reasons

■ Because plaintiff has established a prima facie case, the defendant has the burden of articulating legitimate, nondiscriminatory reasons for not hiring him. Defendant has articulated two such reasons: plaintiff was less qualified than McCormack with regard to CAD; and plaintiff had demonstrated poor communication and interpersonal skills as evidenced by his conduct in connection with his failed attempt to work directly for defendant through his own company, Hi–Speed. These reasons are "clear and reasonably specific." *Burdine*, 450 U.S. at 258, 101 S.Ct. 1089. Accordingly, the burden is on plaintiff to prove that they are a pretext for age discrimination. *See Fisher*, 114 F.3d at 1337 & 1339.

### 3. Pretext

■ To prove pretext, plaintiff must present sufficient evidence to support a

finding that defendant's proffered reasons are not truthful.[6] Plaintiff argues that a rational juror could find the reasons proffered by defendant to be untrue because: 1) defendant has given "shifting explanations" for the hiring decision, (Pl.'s Mem. at 13–24); 2) his "credentials" were "notably superior to those of Mr. McCormack," *id.* at 24; and 3) the Hi–Speed incident was "trivial," *see id.* at 25–28. Defendant counters that: 1) Schaefer has always given the same basic reasons for his decision; 2) McCormack was judged to be superior in terms of CAD skills and interpersonal communication skills; and 3) the Hi–Speed incident was not trivial as far as Schaefer was concerned.

■ The evidence plaintiff relies on to cast doubt on defendant's proffered reasons is insufficient to support a finding that they are not the true reasons for the challenged decision.[7] The record shows that Schaefer has given essentially the same reasons for his decision to hire McCormack for the project engineer's position since defendant filed its first statement of position with the CHRO.[8] At each step in the process, Schaefer has explained that plaintiff was not interviewed because of concerns about his CAD skills and interpersonal communication skills. Thus, this case is distinguishable from the cases plaintiff cites where a jury issue of pretext was presented because the employer had proffered various reasons over time that were inconsistent or even contradictory.

Plaintiff places great weight on the fact that defendant submitted an incorrect position description to the CHRO both initially in response to plaintiff's charge of age discrimination and later in response to his charge of retaliation. The incorrect position description describes a job requiring a minimum of five years of CAD experience (which plaintiff lacked), while the correct job description does not. However, defendant's reply memorandum is accompanied by an affidavit of an attorney in its legal division explaining that the incor-

---

**6.** "We attach the label 'pretext' to a proffered reason that is not credited by the finder of fact." *Id.* at 1337. In *Fisher*, all members of the Second Circuit agreed that a pretext finding establishes "intentional[ ] dissembl[ing]". *Id.*

**7.** A plaintiff may show pretext by demonstrating "such weaknesses, implausibilities, inconsistencies, incoherences, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Anderson v. Coors Brewing Co.,* 181 F.3d 1171, 1179 (10th Cir.1999) (quoting *Morgan v. Hilti, Inc.,* 108 F.3d 1319, 1323 (10th Cir.1997)); *see also Olson ·v. General Elec. Astrospace,* 101 F.3d 947, 951–52 (3d Cir.1996) (same).

**8.** Plaintiff notes that before he filed his CHRO complaint he asked Jackie Beard, a member of defendant's human resources department, to find out why he had not been interviewed and reminded her of his request three days later but nobody got back to him. Defendant's failure to provide plaintiff with an explanation before he filed his complaint with the CHRO does not support a finding of pretext. This is not a case where the decisionmaker refused to provide an explanation until a charge was filed. Plaintiff does not allege that he asked Schaefer for an explanation, he submits no evidence that Beard conveyed his inquiry to Schaefer, and Schaefer has testified that he does not know whether plaintiff ever made such an inquiry. *See* Schaefer Dep. at 223. Moreover, there is no evidence that defendant's failure to respond to plaintiff's request was a deviation from its policies and customary procedures. Schaefer has testified that defendant drew a sharp distinction between internal candidates and external candidates. According to Schaefer, when a position was filled, defendant had a "courtesy policy" of communicating that fact to external candidates who had been interviewed, but he was not aware of any such "courtesy policy" with regard to external candidates who had not been interviewed. *See id.* at 222–24.

rect position description was submitted to the CHRO on two occasions due to clerical errors. (Reznick Aff., Def.'s Reply Mem., Ex. D.) Plaintiff suggests that a jury is uniquely well-suited for the task of determining whether defendant is guilty of attempting to deceive the CHRO. However, there is no evidence that Schaefer was involved in or even knew about the submission of the incorrect position description to the CHRO on either occasion. Thus, those submissions cannot be relied on to undermine the credibility of his explanation for his decision to hire McCormack instead of the plaintiff.

Plaintiff's principal argument with regard to pretext is that his credentials, objectively viewed, were clearly superior to McCormack's. Plaintiff does not contend that his CAD skills were better than McCormack's.[9] Nor does he challenge Schaefer's assessment of McCormack's interpersonal skills. Rather, he alleges that he is a talented designer with more experience than McCormack in machine design and has no history of interpersonal problems.

Crediting plaintiff's allegations,[10] it does not follow that Schaefer's explanation for his decision to hire McCormack is false. To prove that, plaintiff must show that Schaefer's concern about his CAD skills and interpersonal communication skills is pretextual. *See Scaria v. Rubin*, 117 F.3d 652, 655 (2d Cir.1997) (per curiam).

Plaintiff contends that a jury could reject Schaefer's reliance on McCormack's admittedly superior CAD skills as a mask for age discrimination because the position description for the project engineer's position did not explicitly refer to CAD skills. (Pl.'s Mem. at 25 n. 10.) Schaefer's testimony that he wanted a project engineer who was proficient in CAD is consistent with the undisputed fact that all the work done in the Automation Systems group was done with computers. Moreover, his testimony is not inconsistent with the position description because it states that the position would require use of "computers."[11] Viewed in context, the position description provides no reason to disbelieve Schaefer's testimony that he regarded proficiency in CAD as a qualification for the job.[12]

**9.** With regard to CAD skills, Schaefer has testified that although plaintiff's CAD skills were "adequate" for purposes of his work on the Brickpack and Tracer/FX projects, he needed someone who was "fluent" in CAD for the position of project engineer because it was a "a very critical part of the job." Schaefer Dep. at 197. Schaefer has testified that McCormack had "very strong CAD skills," which he "had demonstrated ... very proficiently," Schaefer Dep. at 178, and that McCormack's knowledge of CAD gave him the "ability to work very quickly in CAD" and "take the proper steps to create documentation to [defendant's] standards." *Id.* at 197.

**10.** In addition to his own testimony concerning his qualifications, plaintiff offers an affidavit of an engineer with whom he worked at another company in the 1980s. *See* (Kok Aff., Pl.'s Ex. Z.) The affidavit praises plaintiff as "a true design engineer" who "did very diffi-

cult conceptual work" and whose "ability" to come up with machine designs that "worked" and "serve[d] the needs of ... customers," were "imaginative" and "virtually unique." *Id.* ¶ 3–4.

**11.** In addition, one of the essential functions of the position, as set forth in the detailed description, included "work[ing] in an environment and culture in which Engineers [would]: ... keep abreast of new technologies." Schaefer Aff. Ex. 4.

**12.** The Kok affidavit, which explains that plaintiff did not need CAD skills to succeed in his conceptual design work with another company in the 1980s, does not impeach Schaefer's testimony concerning the importance he attached to CAD skills when it came to selecting someone for the position of project engineer in defendant's Automation Systems group in 1995.

Plaintiff does not deny that the project engineer's position required someone with good interpersonal communication skills.[13] Instead, he submits affidavits of two people with whom he worked at other companies stating that he had a cooperative attitude and worked well with others.[14] Crediting the contents of those affidavits, they do not provide a sufficient basis for a reasonable inference that Schaefer has falsely described plaintiff's interpersonal communication skills as an issue in order to hide the true motives for his decision. *Cf. Hollander,* 172 F.3d at 201 n. 4 (affidavits of co-workers insufficient to permit inference that supervisors who rated plaintiff actually believed his interpersonal skills were adequate).

Plaintiff contends that Schaefer's concern about the Hi–Speed incident could be rejected by a jury as exaggerated. However, plaintiff's own account of the incident shows that Schaefer treated Russo's threat to sue as a matter of some urgency, that Russo's letter was upsetting to Schaefer, and that the amount of time Schaefer spent with the plaintiff in connection with the incident exceeded the total amount of time the two spent together on all other matters. In light of plaintiff's deposition testimony, no jury could find that Schaefer actually thought the Hi–Speed incident was trivial.[15]

The Hi–Speed incident was undoubtedly still fresh in Schaefer's mind when the project engineer's position became available just a few months later. Given the undisputed facts of the incident, and the contents of the position description, it would be surprising if the incident did not affect Schaefer's assessment of plaintiff's qualifications for the job. Plaintiff points out that Schaefer did not document the incident or discipline him. However, there is no evidence regarding Schaefer's customary notetaking or recordkeeping practices (or any other evidence) to support plaintiff's argument that the absence of documentation is a sign of pretext. As for plaintiff's argument with regard to the lack of discipline, it is undisputed that Schaefer spoke with plaintiff shortly after Russo's letter was received and ordered him to fix the problem or leave. Plaintiff has testified that he capitulated because he wanted to keep working. For Schaefer to then terminate plaintiff's assignment (which is the only "discipline" he could have resorted to given plaintiff's status as a contract worker), would have been at odds with his implicit promise to permit plaintiff to remain if the problem was fixed.[16]

13. The position description corroborates Schaefer's testimony that the position required a person who could work well with other members of the group as well as others inside and outside the corporation.

14. *See* James Affidavit, Pl.'s Ex. A, ¶ 6; Kok Affidavit, Pl.'s Ex. Z, ¶ 8.

15. Plaintiff attempts to raise a triable issue of pretext by offering affidavits of two witnesses who once worked for Russo, one as a contract engineer, the other as a corporate employment professional. The engineer's affidavit states, "I cannot imagine a company refusing to hire a talented individual as a direct employee just because it would have to negotiate with a job shop." (Coscia Aff. ¶ 7.) The employment professional's affidavit states, "I cannot imagine a minor dispute between Jack Russo and a job shop engineer keeping that engineer from being considered for a permanent job, particularly with a company that had experience with Jack. It would be too trivial and common an occurrence." (Ryan Aff. ¶ 12.) The opinions of these affiants, even assuming they are admissible, do not impeach Schaefer's testimony that the Hi–Speed incident concerned him and affected his view of plaintiff's qualifications.

16. Plaintiff argues that at a CHRO factfinding conference in February 1997, Schaefer testified about the Hi–Speed incident in a manner that is inconsistent with his deposition testimony in that he discussed the incident only

Viewing the record fully and favorably to the plaintiff, a reasonable juror might well be impressed with plaintiff's achievements and therefore be inclined to second-guess Schaefer's decision to hire someone else. But the record does not support a finding that it was objectively unreasonable for Schaefer to pass up an opportunity to hire plaintiff. Moreover, speculating that Schaefer might have made a mistake in selecting McCormack is not the same as drawing a reasonable inference that his explanation for selecting McCormack is not truthful. To enable a juror to draw such an inference, plaintiff must show that the alleged basis for Schaefer's decision is "so ridden with error that [he] could not honestly have relied upon it." *Lieberman v. Gant,* 630 F.2d 60, 65 (2d Cir.1980) (Friendly, J.). The evidence on which plaintiff relies falls well short of supporting such a finding.[17]

### 3. Discrimination

■ Even assuming that plaintiff has offered enough evidence to support a finding of pretext, which I do not believe he has, "this is far from the end of the matter, for to survive summary judgment, [plaintiff] ha[s] to show not only pretext, but also *either use of a pretext that itself implies a discriminatory stereotype, or use of a pretext to hide age discrimination."* *Hollander,* 172 F.3d at 200; *see also Fisher,* 114 F.3d at 1339 ("[P]laintiff may prevail only if [defendant's] proffered reasons are shown to be a pretext *for discrimination,* either because the pretext finding itself points to discrimination or because other evidence in the record points in that direction—or both."). Plaintiff has not made this showing.

Plaintiff does not contend that either of the reasons proffered by Schaefer to justify his selection of McCormack reflects a discriminatory stereotype.[18] Nor is this a case where rejection of the proffered reasons for the challenged action excludes every possible motive except age discrimination. There is at least some evidence in the record that could be relied on to implicate each of the following nondiscriminatory motives: personal favoritism,[19] nepotism,[20] and a desire to avoid further

---

when asked to do so and referred to it at one point as "a little piece of miscommunication." Plaintiff's evidence concerning what Schaefer said at the factfinding conference is limited to the transcript of the conference. As defendant correctly points out, the transcript is an unreliable guide to the content and tone of Schaefer's testimony because it is woefully incomplete.

17. Even putting aside Schaefer's alleged concerns about CAD skills and interpersonal communication skills, the evidence does not prove that plaintiff was plainly better qualified than McCormack to undertake the essential functions of the project engineer's position. (Def.'s Mem. Ex. J.). Plaintiff, who has acknowledged that he is not familiar with McCormack's qualifications, offers no evidence that McCormack's qualifications for the position, objectively viewed, were notably inferior to his own. Moreover, the record shows that McCormack has a degree in mechanical engineering (plaintiff does not) and got a very positive recommendation from Carl Hultman of the Process Engineering group, who told Schaefer that McCormack was an "excellent" candidate. (Schaefer Aff. ¶ 10.)

18. To be clear, there is no contention that Schaefer's concern about CAD skills reflects an erroneous assumption, based on an age-related stereotype, that plaintiff could not or would not keep up with new technology, or that his concern about plaintiff's interpersonal skills arising from the Hi–Speed incident reflects stereotypical thinking.

19. Schaefer's testimony indicates that he and McCormack used to talk on a casual basis during McCormack's 32 month assignment with the Process Engineering group and that he likes McCormack.

20. It is undisputed fact that McCormack is the son-in-law of one of defendant's foreman.

problems with Russo.[21] Accordingly, plaintiff cannot prevail on his discrimination claim simply by showing that Schaefer's proffered reasons are false. Rather, to prove that he is a victim of age discrimination, he must point to evidence indicating that Schaefer did not hire him because of his age. *See Hollander*, 172 F.3d at 201–02.

Plaintiff contends that he has a triable claim because of the wide difference between his age and McCormack's age. *See* Pl.'s Mem. at 31 (citing *Banks v. The Travelers Companies*, 180 F.3d 358 (2d Cir.1999) and *McCarthy v. Connecticut*, 55 F.Supp.2d 110 (D.Conn.1999)).[22] A substantial difference in age is like any other piece of circumstantial evidence in an age discrimination case. It may help support an inference of discrimination. *See Zimmitti v. Aetna Life Ins. Co.*, 64 F.Supp.2d 69, 82 (D.Conn.1999) (denying defendant's motion for judgment as a matter of law following jury verdict for plaintiff). But it is not necessarily sufficient to support such an inference. *See Fagan v. New York State Elec. & Gas Corp.*, 186 F.3d 127, 134 (2d Cir.1999) (noting that plaintiff, who was 54 years old at time of challenged action, could not defeat summary judgment merely by showing that he was replaced by younger workers whose ages ranged from 41 to 46; "[t]he replacement of an older worker with a younger worker or workers does not itself prove unlawful discrimination"); *Grady v. Affiliated Central, Inc.*, 130 F.3d 553, 561 (2d Cir.1997) (affirming summary judgment for employer, despite 25 year age gap between plaintiff and co-workers, because record bereft of evidence from which factfinder could conclude that plaintiff fired because of age), *cert. denied*, 525 U.S. 936, 119 S.Ct. 349, 142 L.Ed.2d 288 (1998).[23] This is because "[a]n inference is not a suspicion or a guess. It is a reasoned, logical decision to conclude that a disputed fact exists on the basis of another fact." 1 Hon. Leonard B. Sand et al., *Modern Federal Jury Instructions* ¶ 6.01, instr. 6–1 (1999),

**21.** By the time Schaefer made the decision to hire McCormack, he knew that plaintiff's contract with Russo had a restrictive covenant purporting to preclude him from working for defendant for a period of six months following the termination of his employment with Russo unless he obtained Russo's consent.

**22.** The cases plaintiff cites are clearly distinguishable. In *Banks*, a jury verdict in favor of the plaintiff was sustained because a reasonable juror could have found that the plaintiff was preselected for termination in a reduction in force, even though she was recognized as better qualified than the much younger employee who was retained, and "the record appear[ed] to be devoid of any consideration other than the wide age discrepancy between the two candidates that could explain such preferential treatment accorded [the younger employee]." *Banks*, 180 F.3d at 367–68. In *McCarthy*, the employer "proffered different explanations for the [challenged termination] decision at different times." *McCarthy*, 55 F.Supp.2d at 116. Before receiving plaintiff's summary judgment papers, it cited the decisionmaker's "managerial discretion to select an Executive Secretary of his own choosing." *Id.* at 115. After the plaintiff challenged that reason as too vague and conclusory to rebut her prima facie case, it offered an affidavit of the decisionmaker stating that the plaintiff had "repeatedly ignored [his] requests, and engaged in behavior that [he] felt was unacceptable." *Id.* at 116 (second alteration in original) (quoting affidavit of employer). Here, in contrast, Schaefer has provided legitimate, nondiscriminatory reasons for his decision, the reasons have not "shifted," the reasons are not implausible, plaintiff does not deny that the reasons have some basis in fact, and the record contains some evidence pointing to possible third motives.

**23.** In *Banks*, the Court of Appeals recognized that "a disparity in the ages of an ADEA plaintiff and her replacement or successor will not, by itself, always suffice to demonstrate invidious discrimination." *Banks*, 180 F.3d at 367.

*quoted in Bickerstaff v. Vassar College,* 196 F.3d 435, 448 (2d Cir.1999).[24]

The difference in the ages of plaintiff and McCormack, although substantial, does not provide a sufficient basis for concluding that plaintiff is a victim of age discrimination. To ask a jury to deliberate on the basis of such meager, ambiguous evidence would leave the jury to speculation. If the jury held defendant liable for age discrimination, the only evidence one could point to try to justify the verdict would be the difference in ages. Such a verdict could not be sustained under the substantive law of this Circuit. *See Norville v. Staten Island Univ. Hosp.*, 196 F.3d 89, 98 (2d Cir.1999) (judgment as a matter of law properly granted to employer on ADEA claim because, even if employer's proffered reasons for rejecting plaintiff in favor of much younger candidate were pretextual, plaintiff failed to prove that they served as a pretext for age discrimination as required by *Fisher;* claim of age-related animus rested solely on fact that employer asked both candidates what year they graduated from school; plaintiff presented no evidence that purpose of question was to enable employer to determine each candidate's age, and nothing else in record indicated that other candidate was selected because he was younger). *Compare Zimmitti,* 64 F.Supp.2d at 82–84 (employer's post-verdict motion for judgment as a matter of law denied because of wide disparity in age and other factors, including age-related comment by decisionmaker).[25] Accordingly, defendant is entitled to summary judgment on plaintiff's age discrimination claim.[26]

**24.** *Fisher* makes it clear that a trier of fact in a discrimination case may not draw an inference of discrimination from circumstantial evidence that is just as consistent with lawful motives as with the motive prohibited by law. In this respect, it defines the limits of permissible inferences that may be drawn by a trier of fact under the ADEA.

**25.** A jury inference that plaintiff is a victim of age discrimination would be particularly difficult to justify because undisputed facts tend to undermine that inference. It is undisputed that Schaefer reviewed plaintiff's resume and approved his retention as a contract engineer in February 1994, when plaintiff was 61. It is also undisputed that Schaefer complimented plaintiff on his work on one or more occasions and continued to act favorably toward him throughout the length of his stay by retaining him as a contract engineer while terminating the assignments of many other contract workers. *Cf. Grady,* 130 F.3d at 560 ("[W]hen the person who made the decision [at issue] . . . [is] the same person who made the decision to hire, it is difficult to impute to [him] an invidious motivation that would be inconsistent with the decision to hire. This is especially so when the [decision at issue] has occurred only a short time after the hiring."). Furthermore, the evidence establishes that before and after plaintiff's assignment with the Automation Systems group, the group included people over the age of 60, including Moulder. Plaintiff has testified that Moulder always treated him fairly and has a reputation for honesty and integrity. *See* Pl.'s Dep. at 58–59. As noted previously, Schaefer has stated without contradiction that he consulted Moulder and Nizker about plaintiff's interest in the project engineer's position and the three of them agreed that plaintiff was not qualified for the position. *See* Schaefer Aff. ¶ 6; *see also* Def.'s Local Rule 9(c) Statement ¶ 12 and Pl.'s Reply. There is no evidence from Moulder (or anyone else) that plaintiff's age was mentioned in the course of that discussion. Nor is there any other evidence to suggest that plaintiff was not hired because of his age.

**26.** Plaintiff's complaint claims that his temporary position was terminated because of his age. However, defendant's principal memorandum shows that summary judgment should be granted on that claim, plaintiff's memorandum in opposition does not attempt to salvage the claim, defendant's reply memorandum pointedly notes that the claim should therefore be deemed abandoned, and plaintiff has not taken issue with that argument. Accordingly, to the extent the claim remains in the case, defendant's motion for summary

C. *Title VII Retaliation*

■ Plaintiff's retaliatory discharge claim is subject to the same burden shifting rules that apply to his ADEA claim. *See Wanamaker v. Columbian Rope Co.,* 108 F.3d 462, 465 (2d Cir.1997). Thus, he has the initial burden of establishing a prima facie case of retaliation. If he sustains that burden, defendant must articulate some legitimate, nonretaliatory reason for its action. Once that occurs, plaintiff must prove that defendant's reasons are a pretext for retaliation. *See Quinn v. Green Tree Credit Corp.,* 159 F.3d 759, 768–69 (2d Cir.1998)

1. Prima Facie Case

To establish a prima facie case, plaintiff must show that: (1) he participated in a protected activity; (2) defendant was aware of his participation in that activity; (3) he subsequently suffered an adverse employment action; and (4) there was a causal connection between his participation in the protected activity and the adverse employment action. *Id.* at 769. Defendant contends that plaintiff cannot establish the second or fourth elements because the decision to terminate his temporary position was made before the company learned that he had filed a complaint with the CHRO.

Plaintiff has met his minimal burden of establishing a prima facie case. The adverse employment action he complains about was the termination of his assignment with the Automation Systems group. It is undisputed that the termination occurred after he filed his CHRO complaint. The temporal proximity between the filing of the complaint and the termination permits an inference of a causal relationship between the two for purposes of establishing a prima facie case.

■ Accordingly, the burden is on defendant to articulate a legitimate, nondiscriminatory reason for terminating plaintiff's temporary position when it did. Defendant has submitted an affidavit signed by Schaefer stating that as of early December 1995 he planned to terminate plaintiff's assignment by the end of the year due to a continuing decline in workload because he was the contract worker with the least seniority and least amount of work. The affidavit states that Schaefer decided to continue plaintiff's assignment beyond that point based on a workload schedule prepared by Moulder indicating that he still had 36 days of work for plaintiff to complete on the Tracer/FX project. *See* (Schaefer Aff. ¶ 15.) The affidavit further states that on January 22, 1996, Moulder informed Schaefer that he had only 10 days of work left for plaintiff to do and that in light of that report Schaefer planned to terminate plaintiff's assignment 10 days later. *See id.* ¶ 16. Schaefer's affidavit is consistent with a workload schedule prepared by Moulder. *See id.* Ex. 3. Thus, the burden shifts to plaintiff to prove that defendant's proffered explanation is a pretext for retaliation. *See Richardson v. New York State Dep't of Correctional Serv.,* 180 F.3d 426, 443 (2d Cir.1999); *see also Quinn,* 159 F.3d at 769 (2d Cir.1998); *Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1039 (2d Cir.1993).

To prove his retaliation claim, plaintiff relies on the following: a statement by a worker in another department that when plaintiff's temporary position was terminated there was still some work for him to do; the fact that he was participating in a training session when his position was ter-

judgment is granted as to that claim as well, substantially for the reasons stated by defen-

dant.

minated; Schaefer's participation in the termination decision; and the temporal proximity between his CHRO complaint and the termination of his position.

This evidence is insufficient to prove that defendant's reasons are a pretext for retaliation. It is undisputed that plaintiff's assignment was terminated only after his work on the Tracer/FX project was substantially completed. The statement of the worker in the other department is not inconsistent with Schaefer's testimony that there was not enough work in the Automation Systems Group to justify keeping more than two contractors. The training session plaintiff relies on was open to all employees and he was not required to attend.[27] It is undisputed that Schaefer did not know about plaintiff's CHRO complaint until January 31, 1996. And Schaefer's testimony that he planned to terminate plaintiff's position well before then is corroborated by Moulder's workload schedule of December 5, 1995.

The question thus becomes whether the temporal proximity between defendant's receipt of plaintiff's CHRO complaint and the termination of plaintiff's assignment is sufficient to sustain plaintiff's burden of proof with regard to his retaliation claim. In *Quinn*, the Second Circuit stated that a retaliation claim may withstand a motion for summary judgment if there is "a strong temporal correlation" between the protected activity and adverse employment action. *Quinn*, 159 F.3d at 770.[28] In that case, the plaintiff was fired less than two months after initiating an internal sexual harassment complaint, and just ten days after filing a complaint with a state antidiscrimination agency. *Id.* at 769. Defendants claimed that the plaintiff had been fired for poor performance and that the temporal proximity just described was merely a coincidence. To support their position, defendants relied on an internal memorandum and evaluation, plus an affidavit by a client impugning plain-

---

**27.** Plaintiff has testified that Moulder asked him if he would attend. *See* Pl.'s Dep. at 161.

**28.** Generally, temporal proximity, standing alone, is insufficient to carry plaintiff's burden at step three of the *McDonnell Douglas* analysis. Courts in this circuit have typically required some additional evidence. *See Hines v. Hillside Children's Cntr.*, 73 F.Supp.2d 308, 323–24 (W.D.N.Y.1999) (noting that "[i]t is true that a 'strong temporal correlation' between an employee's protected activity and an adverse job action can constitute some evidence of a retaliatory motive," but holding that temporal proximity was not enough to establish pretext for retaliation); *Vails v. The Police Dep't of the City of New York*, 54 F.Supp.2d 367, 378 (S.D.N.Y.1999) (finding a one-day difference between complaint and termination a "coincidence" and therefore insufficient); *Valentine v. Standard & Poor's*, 50 F.Supp.2d 262, 291 (S.D.N.Y. 1999) ("Despite the temporal correlation between plaintiff's filing of the EEOC charge and his termination, he has failed to establish that S & P's proffered reason for dismissing him, his misconduct, was false and that un-

lawful retaliation was the true reason for his discharge."); *Feder v. Bristol–Myers Squibb Co.*, 33 F.Supp.2d 319, 338 (S.D.N.Y.1999) (holding that temporal proximity established pretext because defendant failed to proffer any explanation for the temporal proximity), *aff'd w/out opinion*, 205 F.3d 1327 (2d Cir. 2000); *Reilly v. Metro–North Commuter R.R. Co.*, No. 93 Civ. 7317(PKL), 1996 WL 665620, at *14 (S.D.N.Y. Nov.15, 1996) (holding that temporal proximity, was standing alone, was insufficient to carry plaintiff's burden); *Kazin v. Metro–North Commuter R.R.*, No. 91 Civ. 1331(PKL), 1994 WL 68167, at *7 (S.D.N.Y. Mar. 1, 1994) (same); *see also Colon v. Coughlin*, 58 F.3d 865, 872–73 (2d Cir.1995) (holding, in a prisoner inmate case where claims are viewed with "skepticism," that temporal proximity, standing alone, "might" permit summary judgment); *Smith v. Riceland Foods, Inc.*, 151 F.3d 813, 820 n. 5 (8th Cir.1998) (holding that mere temporal proximity will normally, but not always, be insufficient); *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir.1997) (requiring temporal proximity to be "unusually suggestive" of retaliation).

tiff's performance. *See id.* at 769–70. The Court of Appeals noted that "[n]early all of the record evidence supporting the Company's asserted non-retaliatory reason for discharge both was generated by two of [plaintiff's] alleged harassers ... and followed her initial inquiry with the [state agency] regarding sexual harassment." *Id.* at 770. This evidence suggested a "strong temporal correlation" between plaintiff's complaint and her termination, precluding the entry of summary judgment. *Id.*

In light of *Quinn,* plaintiff could show a "strong temporal correlation" if he had some evidence to undermine defendant's explanation for its action. He does not. He concedes that defendant was downsizing due to a decline in workload. Moreover, defendant's explanation that it decided to terminate plaintiff's position before he filed his CHRO complaint is substantiated by a document created before the CHRO complaint was filed. It is undisputed that Moulder, the author of that document, did not know of plaintiff's CHRO complaint until February 12, 1996, when he informed plaintiff of the termination. In these circumstances, there is not "a sufficient basis for a trier of fact to doubt the persuasiveness of the company's proffered evidence and ultimately to find that the reasons offered by the [defendant] for [plaintiff's] dismissal were pretextual." *Id.* *see also Hines,* 73 F.Supp.2d at 323–24. Accordingly, defendant is entitled to summary judgment on the retaliation claim.

*Conclusion*

For the foregoing reasons, defendant's motion for summary judgment is granted and the action is dismissed. The Clerk may close the file.

So ordered.